STEFON MORANT *v.* STATE OF CONNECTICUT
(AC 20959)

Lavery, C. J. and Flynn and Dupont, Js.

Argued September 26, 2001—officially released February 12, 2002

*Michael A. Fitzpatrick*, for the appellant (petitioner).

*Christopher T. Godialis*, assistant state's attorney, with whom, on the brief, was *Michael Dearington*, state's attorney, for the appellee (respondent).

*Opinion*

LAVERY, C. J. The petitioner, Stefon Morant, appeals from the judgments of two trial courts, one judgment denying the second count of his second amended petition for a new trial and the other denying his fifth amended petition for a new trial. The petitioner claims on appeal that the court, *Hon. William L. Hadden, Jr.*, judge trial referee, improperly denied the second count

of his second amended petition, which was based on allegedly newly discovered evidence. The petitioner also claims that the denial of his fifth amended petition was improper because the court, *Blue, J.*, (1) did not find the testimony of a material witness to be false, (2) ruled that a witness properly invoked his right to remain silent and the court refused to grant that witness immunity, and (3) declined to admit for substantive purposes a witness' out-of-court statements. We affirm the judgments of the trial courts.

The petitioner was convicted of two counts of felony murder stemming from the 1990 killings of Ricardo Turner and Lamont Fields, and that conviction was upheld by our Supreme Court on appeal. *State* v. *Morant*, 242 Conn. 666, 701 A.2d 1 (1997). The court summarized the underlying facts of the petitioner's case, as found by the jury, as follows. "In 1990, the [petitioner] and Scott Lewis were partners engaged in the sale of drugs from a Clay Street house and on Exchange Street, both in New Haven. As part of this drug operation, Ricardo Turner stored drugs and cash in his second floor apartment at 634 Howard Avenue, New Haven. During the night of October 10 and the early morning hours of October 11, 1990, the [petitioner] and Lewis were at the Clay Street house and discussed the possibility that Turner might take the money and leave. Ovil Ruiz and several other individuals who sold drugs for the [petitioner] and Lewis were also present at the Clay Street house during this discussion.

"Two handguns, a .357 caliber and a .38 caliber, were stored in the house. In the early morning hours of October 11, 1990, either the [petitioner] or Lewis told Ruiz to get the guns, and Ruiz gave the guns to Lewis. The [petitioner], Lewis and Ruiz then proceeded to travel in Lewis' automobile to Turner's apartment on Howard Avenue. On the way, the [petitioner] stated, 'whatever happens, you know, keep it between us.' At the apart-

ment, the [petitioner] and Lewis exited the automobile and Ruiz got into the driver's seat. Ruiz then waited in the car while the [petitioner] and Lewis went inside. When the two of them entered the apartment house, the [petitioner] was carrying the .38 caliber handgun and Lewis was carrying the .357 caliber handgun.

"The [petitioner] and Lewis forced their way into Turner's apartment. They were in the apartment for thirty minutes when, shortly after 4 a.m., they fatally shot Turner and his roommate, Lamont Fields. Turner was shot in the head, the back and the side. The bullet that went into his side traveled through his body and into his left arm. Fields was shot twice in the back. One bullet passed through the floor and punctured a waterbed in the apartment below. All of the bullet fragments later recovered by police had been fired from a .357 caliber handgun.

"The [petitioner] and Lewis then ran out of the apartment, down the stairs, and into the waiting car. The [petitioner] took from the apartment a bag that contained money, and Lewis took another bag that contained several ounces of cocaine. As they drove away from the scene, Lewis asked the [petitioner] whether the [petitioner] thought he, Lewis, had killed Turner and Fields. The [petitioner] responded, 'whatever happened, happened.'

"In January, 1991, the [petitioner] gave a statement to police in which he admitted that he was with Lewis during the early morning hours of October 11, 1990. He stated that Lewis was taking him home when Lewis stopped on Howard Avenue near the victims' apartment. The [petitioner] stated that Lewis said 'he had to take care of some business' and would be right back, and that Lewis then entered the apartment building while the [petitioner] waited in the car. The [petitioner] further stated that Lewis was perspiring when he came

running from the apartment building to the car five or ten minutes later.

"The [petitioner] also told police that Lewis sold narcotics and that, when he and Lewis stopped on Howard Avenue, he thought Lewis was going to take care of some drug-related business. The [petitioner] stated that the next day he learned that there had been a murder on Howard Avenue, and that a few days later, Lewis told the [petitioner] that Lewis 'did what [he] had to do' because one of the victims had owed Lewis 'a couple dollars.' The [petitioner] further stated that at some later time he observed Lewis throw the gun that Lewis had used to commit the murders into the Mill River under the Chapel Street Bridge in New Haven." Id., 668–70.

The following additional facts and procedural history are relevant to the issues on appeal. Despite his 1991 statement to police in which he placed himself at the scene of the murders, the petitioner at his 1994 trial presented an alibi defense. He produced three witnesses, two family members and his brother's ex-girlfriend, who claimed that he was in South Carolina on the evening of October 10, 1990. The jury found the alibi evidence not credible and the petitioner was convicted. Lewis also was convicted in a separate trial, and that conviction was upheld on appeal. *State* v. *Lewis*, 245 Conn. 779, 717 A.2d 1140 (1998).

In 1995, Lewis complained to the Federal Bureau of Investigation (FBI) that New Haven police Detective Vincent Raucci, who had been prominently involved in the murder investigation and testified at the petitioner's trial, was corrupt, and had framed Lewis and the petitioner for the killings. Raucci had taken the statements of a number of witnesses when investigating the killings, including Ruiz, whose testimony was important in the petitioner's trial. In response to Lewis' complaint,

FBI agents conducted an investigation. The agents interviewed several people and produced a report.

Ruiz, who had been incarcerated since 1991,[1] was interviewed by FBI agents four times between October, 1996, and February, 1997. He initially told the agents that he had helped Raucci set up the petitioner and Lewis for the murders, and had lied at their trials. Ruiz said that his testimony at the petitioner's trial had been essentially true, but that he had substituted the petitioner's and Lewis' names for those of the real killers. He later provided a different version of events inculpating himself directly, but eventually he retracted entirely his earlier statements to the FBI. Around the time of the FBI investigation, Ruiz communicated to various department of correction employees and fellow inmates that he had lied at the petitioner's and Lewis' trials, and that he now was prepared to tell the truth.

In March, 1997, the petitioner initiated an action for a new trial. He subsequently amended his petition several times. In his second amended petition, he claimed that he should be afforded a new trial on the basis of newly discovered evidence that cast doubt on the integrity of the earlier proceedings. That evidence included, inter alia, a letter from Ruiz to Lewis in which Ruiz claimed that he had lied at Lewis' trial, various statements included in the FBI report and testimony or statements from three additional alibi witnesses.

In April, 1999, trial commenced before the court, *Hon. William L. Hadden, Jr.*, judge trial referee, on the second amended petition. A mistrial was declared on the first count, which pertained to Ruiz's letter and the information in the FBI report, and trial continued on the second count alone, which pertained to the three

---

[1] Ruiz's incarceration stemmed from convictions not related to the murders of Turner and Fields.

new alibi witnesses.[2] In a July 26, 1999 memorandum of decision, the court denied the petition for a new trial insofar as it was based on the second count of the second amended petition.

On October 13, 1999, the petitioner filed a third amended petition as to the first count only, alleging newly discovered evidence resulting from the complete disclosure of the FBI report. The first count was tried before the court, *Blue, J.*, in late October and early November, 1999. On December 20, 1999, during closing argument, the petitioner moved to reopen the evidentiary portion of the hearing so that he might testify, and the court granted that motion. On January, 24, 2000, the petitioner filed a fourth amended petition,[3] which included additional allegations concerning Ruiz's recantations and Ruiz's initial interview with New Haven police. On April 11, 2000, another evidentiary hearing was held at which the petitioner testified. Following that hearing, the petitioner filed a fifth amended petition, adding allegations that his taped statement to police was false and coerced, and that he was in North Carolina or South Carolina at the time of the murders.

In a June 2, 2000 memorandum of decision, the court denied the petitioner's fifth amended petition. Thereafter, the petitioner appealed from both that judgment and from the earlier judgment denying his second amended petition. Additional facts will be provided where necessary.

I

The petitioner claims first that the court improperly denied the second count of his second amended petition for a new trial. That count made claims of newly discov-

[2] A third count was withdrawn.

[3] The fourth amended petition was incorrectly captioned as an "amended third amended petition for new trial."

ered evidence and alleged that it probably would have changed the outcome of the trial. We do not agree.

Pursuant to General Statutes § 52-270, a convicted criminal defendant may petition the Superior Court for a new trial on the basis of newly discovered evidence. See also Practice Book § 42-55. "The standard that governs the granting of a petition for a new trial based on newly discovered evidence is well established. The petitioner must demonstrate, by a preponderance of the evidence, that: (1) the proffered evidence is newly discovered, such that it could not have been discovered earlier by the exercise of due diligence; (2) it would be material on a new trial; (3) it is not merely cumulative; and (4) it is likely to produce a different result in a new trial. . . . This strict standard is meant to effectuate the underlying 'equitable principle that once a judgment is rendered it is to be considered final,' and should not be disturbed by posttrial motions except for a compelling reason. . . . In determining the potential impact of new evidence, the trial court must weigh that evidence in conjunction with the evidence presented at the original trial. . . . It is within the discretion of the trial court to determine, upon examination of all the evidence, whether the petitioner has established substantial grounds for a new trial, and the judgment of the trial court will be set aside on appeal only if it reflects a clear abuse of discretion." (Citations omitted.) *Asherman* v. *State*, 202 Conn. 429, 434, 521 A.2d 578 (1987).

In count two of his second amended petition, the petitioner claimed newly discovered evidence in the form of three additional alibi witnesses, Michele Washington, Joseph Dease and Clarence H. Dixon. Washington is the mother of two of the petitioner's children and lives in South Carolina. Dease is a distant cousin of the petitioner and attended college in South Carolina in 1990. Dixon attended college in North Carolina in

1990 and lived in the same dormitory as the petitioner's brother, Frank Morant. Each of those witnesses testified that after being contacted by the petitioner's investigator in 1998 or 1999, they remembered seeing the petitioner in North Carolina or South Carolina on particular dates in October, 1990, near the time of the October 11, 1990 murders.

Washington submitted a sworn statement prior to the petitioner's evidentiary hearing and testified at that hearing that the petitioner had visited her in South Carolina on the evening of October 10, 1990, for thirty to forty-five minutes and, further, that she saw the petitioner again in South Carolina on October 13, 1990.

Dease testified that the petitioner visited him in the afternoon on October 12, 1990, in Orangeburg, South Carolina. Dixon submitted a sworn statement and testified that he had given the petitioner a ride from Fayetteville, North Carolina, to South Carolina on October 12, 1990, leaving Fayetteville at about 3 or 4 p.m. and arriving in Columbia, South Carolina, at 6 or 7 p.m., and continuing onward to Orangeburg, South Carolina, on October 13, 1990. He testified that the drive between Fayetteville and Columbia takes three hours.

Robert Sweeney, the petitioner's trial counsel, testified that the focus of the petitioner's defense was alibi and that he had met with the petitioner several times to discuss it. As a result of those meetings, three alibi witnesses testified at trial that they saw the petitioner in the Carolinas around the time of the murders. Sweeney testified that he recalled discussing Washington with the petitioner and that although he did not remember specifically, it was "inconceivable" that he would not have considered her as a possible alibi witness He testified repeatedly that he would have contacted Washington and brought her to Connecticut if he had any indication that she would have been a helpful witness.

Sweeney testified that he did not recall ever discussing Dease or Dixon with the petitioner, although he had inquired of the petitioner of his whereabouts on the critical dates. He also testified that the petitioner had retained a private investigator to assist him before trial.

The petitioner also testified at the hearing, stating that he "gave [Sweeney] the names [he] felt were important to [his] case." He confirmed that he had discussed Washington with Sweeney, but did not recall mentioning that he was with her on October 10, 1990. The petitioner said that he did not mention Dease or Dixon to Sweeney because at the time he was uncertain of his dates or methods of travel. He testified that by 1998 or 1999, after speaking with his attorney for the new trial petition, he remembered that he was with Dease and Dixon on October 12 and 13, 1990.

In the opinion of the court, the petitioner failed to show that the alibi evidence was newly discovered, such that it could not have been discovered earlier with due diligence, that the evidence was not cumulative and that along with the evidence produced at the original trial, it likely would produce a different result in a new trial. We agree with those conclusions.

First, the alibi evidence was not newly discovered. The witnesses' testimony that the petitioner submitted was intended to establish that he was in North Carolina or South Carolina on the day before and the two days after the murders, and, therefore, he could not have been in New Haven at the time of the murders. The petitioner, however, did not provide an adequate explanation as to why he could not have produced the three witnesses earlier in light of the fact that his location and company on the dates in question were, necessarily, known to him. Such "evidence relates exclusively to the whereabouts of the [petitioner] himself on [the relevant] date[s]. It is information about himself that, prior to

trial, he had personal knowledge of from his own experience and activities. Such evidence is not, as a matter of law, newly discovered." *Malaspina* v. *Itts*, 3 Conn. Cir. Ct. 651, 653–54, 223 A.2d 54 (1966). Similarly, in *State* v. *Horne*, 19 Conn. App. 111, 131, 562 A.2d 43 (1989), rev'd on other grounds, 215 Conn. 538, 577 A.2d 694 (1990), we held that alibi evidence was not "newly discovered" because once the defendant knew the date of the offense with which he was charged, it was incumbent on him to determine whether there were witnesses that could testify as to his whereabouts.

Furthermore, the main focus of the petitioner's defense at his trial was that he was in the Carolinas at the time of the murders, and, through the provision of information to his attorney and private investigator, he produced three other witnesses at the trial in support of that defense. Given his trial preparation strategy, it is inconceivable that with the exercise of due diligence he would not have remembered and located the other three witnesses, with whom he purportedly visited, dined, drove three hours and spent the night. The petitioner claims, inter alia, that at the time he was arrested and when he prepared for trial, he did not remember what week he was in the Carolinas with Washington, Dease and Dixon, but that in 1999, he was able to recall the precise dates. We note in this regard that "[f]orgotten facts do not constitute newly discovered evidence, and the want of recollection of a fact, which by due diligence and attention might have been remembered, is not ground for a new trial." (Internal quotation marks omitted.) *Malaspina* v. *Itts*, supra, 3 Conn. Cir. Ct. 654; see also 58 Am. Jur. 2d 406, New Trial § 430 (1989). "When a [petitioner] seeks a new trial for newly discovered evidence, he must have been diligent in his efforts fully to prepare his cause for trial; and if the new evidence relied upon *could have been known with reasonable diligence*, a new trial will not be granted."

(Emphasis in original; internal quotation marks omitted.) *State* v. *Roberson*, 62 Conn. App. 422, 427, 771 A.2d 224 (2001).

In addition, the testimony of the three witnesses was cumulative to that offered, and rejected, at the petitioner's trial. At that trial, three witnesses testified that the petitioner was in South Carolina around the time of the murders, though not on the day that they actually occurred. Cumulative evidence is additional evidence of the same kind as that submitted at trial, submitted to prove the same point. 58 Am. Jur. 2d 420–21, supra, § 448. "A new trial is not required if the evidence is merely cumulative or duplicative. . . . Where essentially the same evidence is submitted with somewhat more detail, it is, ordinarily, nonetheless cumulative." (Citation omitted.) *Ginsburg* v. *Cadle Co.*, 61 Conn. App. 388, 392, 764 A.2d 210, cert. denied, 256 Conn. 904, 772 A.2d 595 (2001). At the evidentiary hearing, the petitioner offered new alibi witnesses whose testimony went to the same point as did the testimony of the three alibi witness at his trial. The proffered testimony was, therefore, cumulative.

Last, the court found that the proffered new testimony lacked credibility and, when combined with the evidence presented at the petitioner's trial, would still result in the same verdict. Washington gave testimony different from that in her earlier sworn statement after learning, in the interim, that she had recalled incorrectly a date that had helped trigger her memory of when she saw the petitioner in South Carolina. The testimony of Dease and Dixon regarding the petitioner's whereabouts on the afternoon of October 12, 1990, was inconsistent. Dease placed the petitioner in Orangeburg, South Carolina, while Dixon's testimony established that he was either still in North Carolina, or en route to Columbia, South Carolina. The court rightfully was skeptical regarding the witnesses' ability to remember

precise dates nearly a decade later and the efficacy of the techniques used to refresh their memories.

The new evidence presented at the hearing consisted entirely of witness testimony. "Appellate review of a trial court's decision granting or denying a [petition] for a new trial must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided." (Internal quotation marks omitted.) *State* v. *McIntyre*, 250 Conn. 526, 533, 737 A.2d 392 (1999). Because "it is well established that the evaluation of a witness' testimony and credibility is wholly within the province of the trier of fact"; (internal quotation marks omitted) *Opotzner* v. *Bass*, 63 Conn. App. 555, 564–65, 777 A.2d 718, cert. denied, 257 Conn. 910, 782 A.2d 134 (2001); we must defer to the court's assessment of the credibility of Washington, Dease and Dixon.

"[W]hether a new trial should be granted does not turn on whether the evidence is such that the jury *could* extend credibility to it. . . . The plaintiff must persuade the court that the new evidence he submits will *probably*, not merely possibly, result in a different verdict at a new trial, or that an injustice has been done. . . . It is not sufficient for him to bring in new evidence from which a jury could find him not guilty—it must be evidence which persuades the judge that a jury *would* find him not guilty." (Emphasis in original; internal quotation marks omitted.) *State* v. *Roberson*, supra, 62 Conn. App. 427–28. It is not probable that the testimony presented at the hearing, which lacked consistency and did not exclude the possibility that the petitioner was in New Haven on October 11, 1990, in combination with the evidence adduced at the petitioner's trial, particularly the petitioner's statement to police that he had accompanied Lewis on the night of the murders, would result in a different verdict at a new trial.

Because the evidence set forth at the hearing could have been discovered earlier with due diligence, and merely was cumulative and not likely to lead to a different result in another trial, we conclude that the court did not abuse its discretion in denying the petitioner's second amended petition for a new trial insofar as it was based on the second count of the petition.

## II

The petitioner claims next that the court improperly denied his fifth amended petition for a new trial. Specifically, he argues that the court improperly held that he failed to prove either that the testimony of a material witness at his trial was false or that the newly discovered evidence in this regard would result in a different verdict. We disagree.

Claims of "[f]alse testimony [underlying petitions for new trials] may be of two types: (1) where a material witness admits to perjuring himself at trial or . . . (2) where a material witness has recanted his testimony and claims he was mistaken as to what he said at trial." (Internal quotation marks omitted.) *Channer* v. *State*, 54 Conn. App. 620, 627, 738 A.2d 202, cert. denied, 251 Conn. 910, 739 A.2d 1247 (1999). A petitioner should be granted a new trial on the basis of a claim of false testimony only when "(1) the court is reasonably well satisfied that the testimony of a material witness is false, (2) without it the jury might have reached a different conclusion, and (3) the party seeking a new trial was taken by surprise when the false testimony was given. . . . Appellate review of a trial court's decision in this regard is likewise conducted under an abuse of discretion standard." (Citations omitted; internal quotation marks omitted.) Id.

In *Channer*, we had occasion to clarify the second prong of this test. Citing precedent from our Supreme Court, we noted that in evaluating false testimony

claims, as with other newly discovered evidence claims, "[w]hether a new trial should be granted does not turn on whether the evidence is such that the jury *could* extend credibility to it. . . . The plaintiff must persuade the court that the new evidence he submits will *probably*, not merely possibly, result in a different verdict at a new trial, or that an injustice has been done. *Pradlik* v. *State*, [131 Conn. 682, 686, 41 A.2d 906 (1945)]. It is not sufficient for him to bring in new evidence from which a jury could find him not guilty—it must be evidence which persuades the judge that a jury *would* find him not guilty. . . . *Lombardo* v. *State*, [172 Conn. 385, 390–91, 374 A.2d 1065 (1977)] . . . ." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Channer* v. *State*, supra, 54 Conn. App. 631.

The petitioner argues, on the basis of Ruiz's recantations, that Ruiz and Raucci provided false testimony at his trial. He claims that Ruiz, at Raucci's behest, lied about the petitioner's involvement in the murders and that Raucci testified falsely about the circumstances under which Ruiz gave statements to the police so as to buttress Ruiz's false testimony. To address these claims, we must set out additional facts regarding Ruiz's role in the murder investigation, the statements he gave to police, his testimony at the petitioner's trial and subsequent retractions, and the other evidence presented at the hearing on the fifth petition.

In January, 1991, Ruiz was arrested on an assault charge connected with a December 19, 1990 shooting in New Haven.[4] The victim and a companion were walking on a street when a vehicle containing four men approached and stopped. The men exited the vehicle and fired at the victim. The victim's companion identified Jose Aponte as one of the car's occupants.

[4] Ruiz eventually pleaded guilty and on March 29, 1993, was sentenced to twelve years imprisonment, suspended after six, to be served consecutively with another sentence he already was serving.

Raucci had been investigating the shooting and had spoken with Ruiz in the course of that investigation.[5] Ruiz claimed that he saw the occupants of the vehicle on the night of the shooting and that he spoke with them. He identified three of the occupants, including Aponte, and pointed out Aponte's vehicle. Ruiz said that Aponte had told him that there were two weapons in the car in case the group ran into a rival gang member. Raucci thereafter took a statement from Aponte, who was accompanied by his attorney. Aponte identified Ruiz as the shooter. After verifying other information given by Aponte, Raucci, on January 11, 1991, obtained a warrant for Ruiz's arrest.

On January 14, 1991, while at the police station in conjunction with this arrest, Ruiz was interviewed and eventually provided a statement regarding the murders of Turner and Fields. Raucci conducted the interview, accompanied first by his supervisor, Lieutenant Michael Sweeney, and later by Detective Joseph Pettola. Sweeney initially talked to Ruiz alone, and Ruiz said he knew nothing about the murders. Raucci then began to provide Ruiz with some of the facts of the case to a degree that Sweeney believed was inappropriate. Sweeney asked Raucci to stop telling Ruiz so much about the case. Raucci told Ruiz that if Ruiz provided details about the murders, Raucci would release him.

Sweeney was called away to other matters, and Raucci continued interviewing Ruiz. Ruiz then stated that he had been driving the car on the night of the murders, and that the petitioner and Lewis, armed with two guns, went up to the victims' apartment. He claimed that he heard shots, Lewis and the petitioner returned to the car and the three drove off. Sweeney returned to the interview and spoke with Ruiz alone, during

---

[5] Raucci's December 19, 1991 report of the investigation contained information from a confidential source, later determined to be Ruiz.

which time Ruiz said the information he relayed was untrue and that he had gotten it from Raucci. Raucci then interviewed Ruiz again. Ruiz then said only that he had overheard two people talking about the murder. At this time, Sweeney's shift ended, and Pettola began to participate in the interview.

Ruiz thereafter provided a taped statement to Raucci and Pettola, and later signed a transcription thereof. Ruiz stated that he had worked for Lewis for two years selling drugs. He claimed to have overheard Lewis and the petitioner speaking, and that they said "they had shot two guys." Ruiz stated that Lewis said, "I shot him because . . . he tried [to] run away with my money and my drugs" and that the petitioner replied, "Well, you had to do what you had to do, so you did it." Ruiz also claimed that he saw Lewis dispose of the murder weapon.

On May 28, 1991, Ruiz, in the company of his counsel and Raucci in a state's attorney's office, provided an additional taped statement about the murders. In this statement, Ruiz told Raucci that he had obtained guns for Lewis and the petitioner, and had driven them to the victims' apartment. He stated that he waited in the driver's seat with the car's engine running while Lewis and the petitioner went inside. Ruiz said that while waiting, he spoke with a girl he knew named "Melli." He stated that he and Melli heard gunshots, that Lewis and the petitioner ran from the house carrying bags of drugs and money, and that he, Lewis and the petitioner then drove off. Ruiz's testimony at the petitioner's 1994 trial was consistent with his January 14, 1991 and May 28, 1991 statements.

In 1996 and 1997, Ruiz made several statements to the FBI. On February 22, 1996, he claimed that his 1991 statements and trial testimony were false. Ruiz implicated another neighborhood drug dealer and his

associates in the killings. He stated that Raucci was associated with that drug dealer and that he, Ruiz, had agreed with Raucci to frame Lewis and the petitioner for the murders instead. He said that Raucci had intimate involvement with that drug dealer. Ruiz claimed that Raucci told him to shoot a rival so that when he was arrested for the shooting, he could provide information about Lewis' and the petitioner's involvement in the murders without arousing suspicion.

In his October 24, 1996 statement to the FBI, Ruiz again claimed that all of his earlier statements were false. He stated that he was present at the scene of the murders with two individuals different from those named in his February 22, 1996 statement, and that he, Ruiz, had shot one of the victims. Ruiz began to relay yet another version of events when the interview was concluded. On February 16, 1997, Ruiz provided another statement to the FBI, in which he said that his prior two statements were false and that his testimony at the petitioner's trial was the truth. He claimed that Lewis had pressured him to fabricate the other statements.

When called to testify at the evidentiary hearing on the fifth amended petition, Ruiz invoked his fifth amendment privilege against self-incrimination and refused to testify. The court, therefore, relied on the FBI reports of the statements, as well as testimony regarding the circumstances surrounding their taking and evidence from the petitioner's trial, to determine whether Ruiz's testimony at the petitioner's trial was false.

In support of his claim that Ruiz and Raucci had lied at trial, the petitioner presented testimony from Lieutenant Sweeney, Detective Pettola, Millie Martinez, Hector Ortiz, Jeffrey Rochler and Ray Boyd. The petitioner also testified as to the circumstances of his own inculpatory statement to police and regarding his alibi.

Retired police Detective Vaughn Maher then testified for the state.

Sweeney testified about the circumstances of Ruiz's January, 1991 statement. He testified that his initial interview with Ruiz led him to believe that Ruiz knew nothing about the murders. Sweeney believed that Raucci was giving Ruiz too much information about the murders and that accordingly, Ruiz may have been parroting back what Raucci wanted to hear.

On cross-examination, the state had Sweeney go through Ruiz's statements line by line and point out the parts that consisted of information that Sweeney had heard Raucci give Ruiz. Sweeney pointed out several items of information that Raucci had suggested to Ruiz. He agreed, however, that there was much in Ruiz's statement that he did not hear Raucci suggest. Significantly, Sweeney testified that he did not remember hearing Raucci tell Ruiz the names of the petitioner and Lewis. Sweeney acknowledged that it was a standard police technique to give an interviewee some information with the expectation of receiving more in return, although he thought Raucci was taking it too far.

Pettola also testified as to the circumstances surrounding Ruiz's January, 1991 statement. He testified that he did not think that Raucci had been overly suggestive or that Raucci had handled the interview improperly.

Martinez testified that a statement she had given to Raucci during the murder investigation was false and that Raucci had told her what to say.[6] In her statement, Martinez said that she was out walking late at night when she came across Ruiz, with whom she was acquainted, waiting in a car near the murder scene. She said that she spoke with Ruiz for awhile until the two

---

[6] Martinez did not testify at the petitioner's trial.

heard gunshots, at which time Ruiz made a U-turn and left.

Ortiz also testified that a statement he had given to Raucci during the murder investigation was false and that Raucci had told him what to say.[7] In his statement, Ortiz said that he knew the petitioner and Lewis, and that they sold drugs. He identified photographs of the petitioner and Lewis, and described Lewis' car. Ortiz said that he also knew one of the victims and had seen him with Lewis.

Rochler was Lewis' friend and his employer around the time of the murders. He testified that he told Raucci that Lewis was working on the night of October 11, 1990. Boyd was a friend of one of the victims and testified that he never saw Lewis or the petitioner in his company.

When the petitioner took the witness stand, he testified that his statement to the police, in which he placed himself at the scene of the murders with Lewis, was false. He claimed that he had been drinking and smoking marijuana earlier in the day, and that he told Raucci what Raucci wanted to hear so that he would be allowed to leave. The petitioner also reiterated some of his alibi defense, as presented in the hearing on his second petition.

Maher was present when the petitioner gave his statement. He testified that Raucci did not tell the petitioner what to say, and that the petitioner was "perfectly lucid" during the interview and never asked to leave. Maher testified that the petitioner directed Maher and Raucci to the site of the murders, and also showed them where Lewis had disposed of the murder weapon.

We turn now to the court's evaluation of the various evidence before it. First, the court considered the facts and circumstances surrounding the shooting that Ruiz

---

[7] Ortiz did not testify at the petitioner's trial.

purportedly staged at Raucci's request to make more credible Ruiz's subsequent provision of information regarding the homicides. After noting that the entire scenario suggested by the petitioner was "intrinsically implausible," the court went on to highlight its especially questionable aspects. The court considered the significant lapse of time between the shooting and Ruiz's arrest, the interim police investigation involving numerous individuals, the uncontested and detailed documentary evidence of that investigation and the pursuance of a false lead suggested to Raucci by Ruiz. The court concluded that "[t]he overwhelming evidence demonstrates that Ruiz's description [of a staged shooting] is not credible."

We see no reason not to defer to the court's finding as to the circumstances of Ruiz's arrest. Despite the large number of people involved in the investigation of the shooting, there was no evidence directly supporting the proposition that it was staged except for the report of one of Ruiz's recantations to the FBI, a statement Ruiz later disavowed. We note that "[i]t is for the trial court as the fact finder to determine the credibility of the recantations. [I]t is the court's right to consider evidence, draw logical deductions and make reasonable inferences from the facts proven." (Internal quotation marks omitted.) Id., 630. The court, therefore, was entitled to disbelieve Ruiz's claim that his arrest was staged.

The court also analyzed the evidence surrounding Ruiz's January, 1991 and May, 1991 statements to the police to determine whether they in fact were false and the product of Raucci's coercion. Ruiz's testimony at the petitioner's trial was consistent with those statements. The court credited Sweeney's testimony, and acknowledged that the January, 1991 statement was obtained under suspicious circumstances and that Raucci did give Ruiz a number of details about the case. It noted, however, that because Ruiz in his retractions

did not alter the details surrounding the crime but only the identity of the killers, those specifics were not in dispute. The court considered it most significant that there was no evidence before it to suggest that Raucci had provided Ruiz with the most crucial piece of information, that is, that the petitioner and Lewis were the killers. It also considered the circumstances surrounding Ruiz's May, 1991 statement, specifically that the statement was taken in the state's attorney's office and that Ruiz was accompanied by his attorney. The court concluded that the circumstances, content and timing of the statements were inconsistent with the petitioner's theory that he had been framed.

First, the court considered it unlikely that if Raucci and Ruiz were conspiring to frame the petitioner, Ruiz would have waited until several months after his arrest to provide the most damaging information. The court also considered it improbable that Raucci successfully could have orchestrated Ruiz's statement in the presence of Ruiz's attorney, as he might have been able to do in a more private setting, absent collusion with Ruiz's attorney as well. Finally, it noted that Ruiz's statements were consistent with the petitioner's statement to the police. The court concluded that it was far more likely that Ruiz was telling the truth and, therefore, also told the truth when he testified at the petitioner's trial. We see no reason to disturb the court's findings as to the truthfulness of Ruiz's statements to the police because those findings resulted from the court's assessment of the strength of the evidence and the credibility of witnesses. Again, "[i]t is the sole province of the trial court to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Internal quotation marks omitted.) *State* v. *Breckenridge*, 66 Conn. App. 490, 498, 784 A.2d 1034, cert. denied, 259 Conn. 904, 789 A.2d 991 (2001).

The court next found Ruiz's recantations to the FBI and his alternate claims regarding the murders not credible. It noted that, unlike his trial testimony, the recantations and claims were not subject to cross-examination and were not corroborated by other evidence. Furthermore, they subsequently were retracted. Where a statement is made under oath and its maker is subject to cross-examination, the law considers that statement to bear significant indicia of reliability. *State* v. *Joyner*, 255 Conn. 477, 480 n.3, 774 A.2d 927 (2001). In addition, recognized indices of unreliability of a recantation include "the fact that the recantation is later repudiated," and "the fact that the evidence supports the original trial testimony, while the recantation testimony lacks corroboration." 58 Am. Jur. 2d 416–17, supra, § 442. The court's finding, therefore, was proper.

The court's findings as to the impact of the remainder of the evidence were largely assessments of credibility and logical relevance. The court found the testimony of Martinez and Ortiz to be "wholly incredible," "unconvincing" and "add[ing] nothing to the corpus of believable evidence in the case." Furthermore, based on the contents of the petitioner's tape-recorded statement to the police, the court found that it was more believable than his testimony at the hearing. Finally, it rejected Rochler's testimony "as inconsistent with much credible evidence to the contrary." Again, we must defer to the court's findings regarding the credibility of those witnesses because it heard and observed their testimony firsthand. "As a practical matter, it is inappropriate [for an appellate court] to assess credibility without having watched a witness testify, because demeanor, conduct and other factors are not fully reflected in the cold, printed record." (Internal quotation marks omitted.) *Lewis* v. *Statewide Grievance Committee*, 235 Conn. 693, 709–10, 669 A.2d 1202 (1996) (*Berdon, J.*, concurring). Regarding Boyd's testimony that he never

saw the petitioner with the murder victims, we agree with the court that even if that testimony were true, it does nothing to establish the falsity of any testimony at the petitioner's trial.

The petitioner in his brief urges us to adopt a different interpretation of the evidence than did the court and repeatedly argues that "there was other evidence in the case from which the court *could have* concluded that Ruiz gave false testimony at trial . . . ." (Emphasis added.) In so doing, the petitioner disregards his burden of proof and misconstrues our standard of review. A petition for a new trial is a civil action, and the petitioner bears the burden of proving, by a preponderance of the evidence, that a new trial was warranted. *Seebeck* v. *State*, 246 Conn. 514, 545, 717 A.2d 1161 (1998). On appeal, we do not review the trial court's decision and ask whether on the evidence presented, it *could have* concluded otherwise. Instead, "[i]n reviewing claims that the trial court abused its discretion, great weight is given to the trial court's decision and every reasonable presumption is given in favor of its correctness. . . . We will reverse the trial court's ruling only if it could not reasonably conclude as it did." (Internal quotation marks omitted.) *Channer* v. *State*, supra, 54 Conn. App. 628–29.

We conclude that the court properly found that the petitioner did not sustain his burden of proving that the testimony of a material witness was false or that newly discovered evidence would probably result in a different verdict.[8] The court, therefore, did not abuse its discretion in denying the fifth amended petition.

---

[8] Because the court found that the petitioner failed to show that the testimony of a material witness was false or that newly discovered information would lead to a different verdict, it did not address the question of whether the allegedly false testimony resulted in surprise to the petitioner. See *Channer* v. *State*, supra, 54 Conn. App. 627. We similarly need not reach that question.

## III

The petitioner claims next that the court made an improper ruling regarding a witness' invocation of his right to remain silent and, further, improperly refused to grant that witness immunity. Specifically, he claims that the court should not have allowed Ruiz to invoke his right to remain silent but that once the court did so, it was obligated to grant Ruiz immunity and thus to compel him to testify. We address these claims in turn.

### A

The petitioner argues that the court improperly allowed Ruiz to invoke his right to remain silent. We are not convinced.

At the hearing, when Ruiz was called to testify, he invoked his fifth amendment privilege as to all substantive questioning relating to the murder investigation.[9] The court, after considering the arguments of the petitioner's counsel that the privilege did not apply, held that it had been properly invoked.

"Both the United States and Connecticut constitutions ensure that [a]ll persons enjoy a constitutional right of immunity from being compelled to testify against themselves. U.S. Const., amend. V; Conn. Const., art. I, § 8. . . . A witness must affirmatively claim this privilege against self-incrimination when taking the stand to testify. *State* v. *Smith*, 201 Conn. 659, 664, 519 A.2d 26 (1986)." (Citations omitted; internal quotation

---

[9] Specifically, Ruiz invoked the privilege in response to questions regarding whether he told the truth at the petitioner's and Lewis' trials, whether the petitioner and Lewis participated in Fields' and Turner's murders, when those murders occurred, whether he and the petitioner and Lewis were at the murder scene, whether he had any personal knowledge regarding the murders, whether he met with Raucci to discuss the murders, whether he worked as an informant for Raucci, whether he had written a letter to Lewis saying that he had lied about Lewis' involvement in the murders and what he had told the FBI.

marks omitted.) *State* v. *Wilkes*, 37 Conn. App. 456, 461, 656 A.2d 1061 (1995), rev'd on other grounds, 236 Conn. 176, 671 A.2d 1296 (1996).

"[The fifth amendment] can be asserted in any proceeding . . . and it protects against any [disclosures] that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used. *Kastigar* v. *United States*, 406 U.S. 441, 444–45, 92 S. Ct. 1653, 32 L. Ed. 2d 212, reh. denied, 408 U.S. 931, 92 S. Ct. 2478, 33 L. Ed. 2d 345 (1972)." (Internal quotation marks omitted.) *State* v. *Biller*, 190 Conn. 594, 600, 462 A.2d 987 (1983). Where a conflict between the two arises, "the accused's right to compel testimony must give way to the witness' privilege against self incrimination . . . ." *State* v. *Simms*, 170 Conn. 206, 209, 365 A.2d 821, cert. denied, 425 U.S. 954, 96 S. Ct. 1732, 48 L. Ed. 2d 199 (1976).

For a trial court properly to sustain a witness' invocation of the privilege against self incrimination, "it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." (Internal quotation marks omitted.) Id., quoting *Hoffman* v. *United States*, 341 U.S. 479, 486–87, 71 S. Ct. 814, 95 L. Ed. 1118 (1951). "Conversely, before refusing to allow the privilege, the trial court must find that the answers to any questions proposed cannot possibly have a tendency to incriminate. . . . The privilege against self-incrimination depends on the mere possibility of prosecution. *State* v. *Williams*, 200 Conn. 310, 319, 511 A.2d 1000 (1986)." (Citations omitted.) *State* v. *Cecarelli*, 32 Conn. App. 811, 819, 631 A.2d 862 (1993).

"[I]n applying the required test for denying the invocation of the privilege it must be *perfectly clear*, from a

careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency to incriminate." (Emphasis in original; internal quotation marks omitted.) *State* v. *Williams*, supra, 200 Conn. 319, quoting *Hoffman* v. *United States*, supra, 341 U.S. 488.

The petitioner claims first that by testifying at the hearing, Ruiz could not have exposed himself to perjury charges because his testimony would have been the truth. In support of this argument, he cites case law holding that invocation of the privilege may not be based on one's *anticipated* perjury on the witness stand. See *United States* v. *Vavages*, 151 F.3d 1185, 1192 (9th Cir. 1998); *United States* v. *Whittington*, 783 F.2d 1210, 1218 (5th Cir.), cert. denied, 479 U.S. 882, 107 S. Ct. 269, 93 L. Ed. 2d 246 (1986). This argument, however, misses the mark. If Ruiz had not claimed the privilege and had testified as the petitioner claims he would have, and if we assume that that testimony actually was truthful, Ruiz would expose himself to perjury charges based not on that testimony, but on his testimony at Lewis' trial[10] and on his prior contradictory statements to the FBI. Although the petitioner in his reply brief claims that Ruiz's "limited immunity agreement with the government" would have precluded a perjury prosecution, he provides no proof, detail or argument in support of the existence, scope or applicability of said agreement.

The petitioner also argues, inter alia, that because Ruiz has not been arrested or charged in connection with Fields' and Turner's murders, he necessarily would not be charged, even were he to provide incriminating testimony as to his involvement. We reiterate, however

---

[10] Lewis' trial was in 1995 and the petitioner's trial was in 1994. As such, at the time of the hearing in 1999, the five year statute of limitations for perjury had expired as to Ruiz's testimony in the petitioner's trial, but not as to his testimony in Lewis' trial. See General Statutes §§ 53a-156, 54-193 (b).

that "[t]he right to one's privilege against prosecution that could result from the testimony sought does not depend upon the likelihood of prosecution but upon the *possibility* of prosecution." (Emphasis in original; internal quotation marks omitted.) *In re Keijam T.*, 226 Conn. 497, 504, 628 A.2d 562 (1993). Given the self-incriminating nature of the versions of events that Ruiz relayed prior to the hearing in which he invoked the privilege, it was far from perfectly clear that were he to testify at the hearing, his testimony could not possibly have tended to incriminate him as to his participation in the murders. Because a prosecution for murder is not time barred; General Statutes §§ 53a-54a (c), 54-193 (a); and because the state did not secure Ruiz's testimony at the petitioner's trial with an agreement not to prosecute, the possibility of Ruiz's prosecution for his involvement in the crimes remained intact.

We conclude that the court was correct in its determination that Ruiz properly invoked the privilege against self-incrimination.

B

The petitioner argues further that the court was obliged to grant Ruiz immunity from prosecution so that he would testify. We disagree.

Following the court's ruling that Ruiz had properly invoked his fifth amendment privilege, the petitioner moved the court to order the state to grant Ruiz immunity so as to compel his testimony. After hearing argument, the court denied that motion, noting that it lacked the discretion to grant Ruiz immunity and that even if it had that discretion, it would be inappropriate to confer immunity in this case. The petitioner thereafter moved the court, pursuant to federal due process law, to extend immunity to Ruiz on its own, which motion the court denied.

We note at the outset that a witness' immunity from prosecution typically arises from the application of General Statutes § 54-47a.[11] That statute "authorizes the prosecution to grant immunity to state witnesses under certain circumstances. [Our Supreme Court has] explicitly held that § 54-47a confers no such authority upon the courts with regard to defense witnesses. See *State* v. *Simms*, [supra, 170 Conn. 210–11]. Indeed [the court] has held repeatedly that there is no authority, statutory or otherwise, enabling a trial court to grant immunity to defense witnesses. See *State* v. *McIver*, 201 Conn. 559, 566–68, 518 A.2d 1368 (1986); *State* v. *McLucas*, 172 Conn. 542, 561, 375 A.2d 1014, cert. denied, 434 U.S. 855, 98 S. Ct. 174, 54 L. Ed. 2d 126 (1977); *State* v. *Simms*, supra, 210–11." *State* v. *Holmes*, 257 Conn. 248, 253–54, 777 A.2d 627 (2001). The court recently declined to revisit those holdings. Id., 254.

The petitioner argues that despite the holdings of Connecticut's courts, the court's ruling that it lacked discretion to grant Ruiz immunity was improper because the court had such power under the federal constitution. The petitioner cites three federal courts of appeal decisions in support of that proposition. Our Supreme Court in *Holmes* recently recognized that "other courts have held that under certain compelling circumstances the rights to due process and compul-

---

[11] General Statutes § 54-47a (a) provides in relevant part that "[w]henever in the judgment of the Chief State's Attorney, a state's attorney or the deputy chief state's attorney, the testimony of any witness . . . in any criminal proceeding involving . . . [a] class A, B or C felony or unclassified felony punishable by a term of imprisonment in excess of five years for which the Chief State's Attorney or state's attorney demonstrates that he has no other means of obtaining sufficient information as to whether a crime has been committed or the identity of the person or persons who may have committed a crime, before a court or grand jury of this state . . . is necessary to the public interest, the Chief State's Attorney, the state's attorney, or the deputy chief state's attorney, may, with notice to the witness, after the witness has claimed his privilege against self-incrimination, make application to the court for an order directing the witness to testify . . . ."

sory process under the federal constitution require the granting of immunity to a defense witness"; id.; but, having found those circumstances lacking, declined to opine on whether the other courts' theories were correct. Id., 255. We conclude that the circumstances here are similarly lacking.

We note first that this is not a compelling case for the recognition of judicially crafted immunity because it is not an appeal from a criminal conviction, but from the denial of a petition for a new trial and, as such, an accused's constitutional right to present an effective defense is not implicated. *Seebeck* v. *State*, supra, 246 Conn. 545. Furthermore, the petitioner requests that we recognize a narrowly crafted doctrine that rarely has been employed; see generally annot., 4 A.L.R.4th 617, 625–33, §§ 4 through 5 (1981); but provides no analysis of how the tests that courts have developed for the judicial granting of immunity apply to the facts of his case. Accordingly, we address the matter only briefly.

First, "[u]nder the effective defense theory, as developed by the Third Circuit Court of Appeals, the trial court has the authority to grant immunity to a defense witness 'when it is found that a potential defense witness can offer testimony which is clearly exculpatory and essential to the defense case and when the government has no strong interest in withholding . . . immunity . . . .' *Government of the Virgin Islands* v. *Smith*, 615 F.2d 964, 974 (3d Cir. 1980); see generally *People* v. *Lucas*, 12 Cal. 4th 415, 460, 907 P.2d 373, 48 Cal. Rptr. 2d 525 (1995), cert. denied, 519 U.S. 838, 117 S. Ct. 114, 136 L. Ed. 2d (1996). The Third Circuit has held explicitly that under the effective defense theory '[i]mmunity will be denied if the proffered testimony is found to be ambiguous [or] not clearly exculpatory . . . .' *Government of the Virgin Islands* v. *Smith*, supra, 972." *State* v. *Holmes*, supra, 257 Conn. 255. In this case, Ruiz's vacillation, from accusation of third

parties to inculpation of himself to complete retraction, is a paradigm of ambiguity. Additionally, the prosecution had a strong interest in refusing to grant immunity to a witness who might disclose greater self-involvement in a murder case than he had previously. Accordingly, the effective defense theory of immunity, even if recognized, would not apply to this case.

Next, under the prosecutorial misconduct theory of immunity, it has been recognized that " 'the due process clause [constrains] the prosecutor to a certain extent in [the] decision to grant or not to grant immunity.' *United States* v. *Angiulo*, [897 F.2d 1169, 1191 (1st Cir.), cert. denied, 498 U.S. 845, 111 S. Ct. 130, 112 L. Ed. 2d 98 (1990)]. Under this theory, however, the constraint imposed by the due process clause is operative only when the prosecution engages in certain types of misconduct. See *United States* v. *Diaz*, 176 F.3d 52, 115 (2d Cir. 1999) (court must find that 'the government, through its own overreaching, has forced the witness to invoke the Fifth Amendment or, that the government has engaged in [the] discriminatory use of grants of immunity to gain a tactical advantage; second, the witness' testimony must be material, exculpatory and not cumulative; and third, the defendant has no other source to obtain the evidence'); *Curtis* v. *Duval*, 124 F.3d 1, 9 (1st Cir. 1997) (defendant must show that prosecution has intentionally distorted fact-finding process by harassing or intimidating potential witnesses or deliberately withholding immunity for purpose of hiding exculpatory evidence from jury); see also *United States* v. *Whitehead*, 200 F.3d 634, 640 (9th Cir.), cert. denied, 531 U.S. 885, 121 S. Ct. 202, 148 L. Ed. 2d 141 (2000); *United States* v. *Hooks*, 848 F.2d 785, 799 (7th Cir. 1988); *Government of the Virgin Islands* v. *Smith*, supra, 615 F.2d 968–69; *Carter* v. *United States*, 684 A.2d 331, 341 (D.C. 1996); *State* v. *Peterson*, 532 N.W.2d

813, 822 (Iowa App. 1995)." *State* v. *Holmes*, supra, 257 Conn. 256–57.

In this case, the petitioner does not direct us to any prosecutorial impropriety or misconduct whatsoever, nor does our examination of the record reveal any. Indeed, there is no evidence in the record that the state even had any contact with Ruiz outside of the courtroom since the trials of Lewis and the petitioner. Further, as we already have noted, it is unclear that Ruiz's testimony, had he been granted immunity, would have been exculpatory. Thus, the petitioner's claim also would fail under the prosecutorial misconduct theory of immunity. We therefore conclude that the court's ruling was correct.

### IV

The petitioner's last claim is that the court improperly refused to admit for substantive purposes Ruiz's out-of-court statements. He argues that the statements that Ruiz made to the FBI and to others should have been admitted under the declarations against penal interest or residual exceptions to the hearsay rule.[12] These claims are without merit.

At the hearing on the fifth amended petition, after Ruiz invoked his testimonial privilege, the petitioner sought to introduce for substantive purposes a number of Ruiz' out-of-court statements. These included the reports paraphrasing the statements Ruiz made to the FBI in 1996 and 1997, and the testimony of four individuals regarding things each had heard Ruiz say around the time of the FBI investigation. The court considered in turn each evidentiary offering and ruled that they were admissible to show inconsistency, but not for substantive purposes because the necessary showings of reliability were lacking.

---

[12] See Conn. Code Evid., §§ 8-6 (4), 8-9.

We first note our standard of review. "A trial court's ruling on the admissibility of evidence is entitled to great deference and will be overturned only if a clear abuse of the court's discretion is shown and the defendant shows that the ruling caused substantial prejudice or injustice. . . . An appellate tribunal is required to make every reasonable presumption in favor of upholding the trial court's ruling." (Citation omitted; internal quotation marks omitted.) *State* v. *Bryant*, 61 Conn. App. 565, 573, 767 A.2d 166 (2001).

The petitioner claims that Ruiz's hearsay statements were against Ruiz's penal interest and, therefore, were admissible. "A *trustworthy* third party statement exculpatory of the accused and against the penal interest of the declarant is admissible . . . if the declarant is unavailable. . . . The determination of whether such a statement is sufficiently trustworthy to be admitted into evidence . . . lies within the sound discretion of the trial court. . . .

"Four considerations have been deemed relevant when examining the trustworthiness of declarations against penal interest: (1) the time of the declaration and the party to whom the declaration was made; (2) the existence of corroborating evidence in the case; (3) the extent to which the declaration is really against the declarant's penal interest; [and] (4) the availability of the declarant as a witness." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Lopez*, 239 Conn. 56, 70–71, 681 A.2d 950 (1996). "No single factor in the test for determining trustworthiness is necessarily conclusive . . . the factors are reflective of the fact that there can be no precise formulation of the proof which would constitute sufficient evidence of the trustworthiness of such declarations." (Internal quotation marks omitted.) *State* v. *Reis*, 33 Conn. App. 521, 529, 636 A.2d 872, cert. denied, 229 Conn. 901, 640 A.2d 118 (1994).

The following additional facts are necessary for our resolution of this issue, some of which we reiterate. In his February 22, 1996 statement, Ruiz told the FBI that he lied under oath about Lewis' and the petitioner's being involved in the murders of Turner and Fields. He stated that his earlier testimony was essentially true, but that he substituted Lewis and the petitioner for the identities of the real killers. He claimed that others actually were behind the killings, and that he, Ruiz, had agreed to help Raucci "set up" Lewis and the petitioner to be arrested instead. In his October 24, 1996 statement, Ruiz claimed that he participated in the murders along with individuals different from those he had named in his February 22, 1996 statement. Ruiz stated that he shot Fields in the chest with a .357 caliber weapon and that another individual shot Turner with a .38 caliber weapon. When informed that this information was inconsistent with the physical evidence, Ruiz began to provide still another version of events at which point the interview was concluded. Finally, in his February 16, 1997 statement, Ruiz said that his earlier statements to the FBI were false, that he had been pressured to lie by Lewis, and that the testimony he had given at the trials of the petitioner and Lewis was the truth. The petitioner offered the statements as evidence at the hearing.

The petitioner also offered testimony from Lisa Cannon, Brent Mollin, Leonard Jackson and Sean Spencer, all of whom had contact with Ruiz while he was incarcerated. Cannon, a correction officer, testified that Ruiz told her that he had lied about the petitioner's and Lewis' involvement in the murders of Turner and Fields. Mollin, another correction officer, testified that Ruiz told him that Lewis had been set up for the murders and that Ruiz had lied about Lewis' involvement. Jackson, a correction counselor, testified that he had overheard Ruiz talking to an unspecified person on the telephone

and that Ruiz had said, "They're trying to keep me quiet. They don't want me to talk, but I'm going to talk." Spencer, a fellow inmate of Ruiz's, testified that Ruiz had told him, inter alia, that the petitioner and Lewis did not commit the murders and that the police or prosecutors were corrupt.

It is clear that Ruiz was not available as a witness because of his invocation of his fifth amendment privilege, and it is not contested that at least some of his statements are against his penal interest. We therefore confine our examination to the timing of the declarations, the parties to whom they were made and the evidence corroborating them. *State* v. *Payne,* 219 Conn. 93, 115–16, 591 A.2d 1246 (1991). We emphasize that "[t]he corroboration requirement . . . is significant and goes beyond minimal corroboration." *State* v. *Rosado,* 218 Conn. 239, 249, 588 A.2d 1066 (1991).

"Third party statements exculpating an accused are [especially] suspect . . . ." Id. Ruiz's out-of-court statements thus are the type of remarks that the law regards with skepticism. Not only do the statements conflict with Ruiz's testimony at the trials of Lewis and the petitioner, during which Ruiz was subject to cross-examination, they are hopelessly inconsistent even with each other. Furthermore, in his final statement to the FBI, Ruiz made a complete retraction of the earlier statements in which he exculpated the petitioner. The petitioner in his brief does not attempt to explain the inconsistencies among Ruiz's statements to the FBI, nor does he direct us to specific evidence that corroborates the exculpatory versions of events relayed within those statements.[13] We note in this regard that Ruiz's statement of October 24, 1996, in which he identifies himself as a shooter, is completely contradictory to the

---

[13] Any corroboration that we can discern from the record is peripheral at best.

physical evidence presented at the petitioner's trial, which established that both Turner and Fields were shot in the back with a .357 caliber weapon. In addition, the parts of Ruiz's statements that exculpate the petitioner are wholly inconsistent with the petitioner's statement to the police in which he admitted being present at the murder scene. See *State* v. *Payne*, supra, 219 Conn. 116 (hearsay statement inadmissible where contradicted by defendant's testimony). Under these circumstances, we cannot say that the court abused its discretion when it refused to admit for substantive purposes Ruiz's statements to the FBI.

Ruiz's statements to Cannon, Mollin, Jackson and Spencer are precisely the type that courts consistently have declined to admit because of their inherent untrustworthiness. According to the petitioner, Ruiz revealed the purported truth not at the time of the murders or at the petitioner's or Lewis' trials, but years later after allegedly innocent people were convicted and sentenced. Moreover, he confided not in close personal friends, but in a fellow inmate and prison personnel. As with the FBI reports, Ruiz's oral remarks lacked substantial corroboration. In *State* v. *DeFreitas*, 179 Conn. 431, 453–54, 426 A.2d 799 (1980), the court found that a statement made under such circumstances was not trustworthy. See also *State* v. *Hernandez*, 204 Conn. 377, 392–94, 528 A.2d 794 (1987); *State* v. *Reis*, supra, 33 Conn. App. 528; cf. *State* v. *Gold*, 180 Conn. 619, 634, 431 A.2d 501 (declarations trustworthy when made within three months of crime, to personal friends and accompanied by myriad of corroborating circumstances), cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980).

The petitioner also offered Ruiz's statements pursuant to the residual exception to the rule disallowing hearsay evidence. "The 'residual,' or 'catch-all,' exception to the hearsay rule allows a trial court to admit

hearsay evidence not admissible under any of the established exceptions if: (1) there is a 'reasonable necessity for the admission of the statement,' and (2) the statement is 'supported by the equivalent guarantees of reliability and trustworthiness essential to other evidence admitted under the traditional hearsay exceptions.' " *State* v. *Lewis*, supra, 245 Conn. 805. For the reasons previously explained, we agree with the court's determinations that the statements that the petitioner sought to introduce were not reliable and trustworthy such that they met the second prong of the test to be admitted under the residual exception to the hearsay rule.

We conclude that the court did not abuse its discretion by ruling that Ruiz's out-of-court statements to the FBI, Cannon, Mollin, Jackson and Spencer were not admissible as either statements against penal interest or under the residual exception to the hearsay rule because each of these statements was not sufficiently trustworthy.

The judgments are affirmed.

In this opinion the other judges concurred.