## TROY S. THOMAS *v.* STATE OF CONNECTICUT*

Superior Court, Judicial District of Hartford

File No. CV-07-5014849-S

Memorandum filed May 19, 2009

*Proceedings*

*John L. Stawicki*, for the petitioner.

*Terri L. Sonnemann*, assistant state's attorney, for the respondent.

HON. JOHN F. MULCAHY, JR., JUDGE TRIAL REFEREE. This is an amended petition for a new trial filed January 22, 2009. The petitioner, Troy S. Thomas, alleges that "uncharged misconduct" witnesses (Detectives Nathaniel Ortiz and Alfred Henderson) engaged in criminal activity resulting in subsequent arrests and convictions, which, at a new trial, would be used to impeach their testimony. It is also asserted that such information is newly discovered, could not have been discovered earlier by the exercise of due diligence, is

---

* Affirmed. *Thomas* v. *State*, 130 Conn. App. 533, 24 A.3d 12 (2011).

material, not merely cumulative, and likely to produce a different result upon retrial.

The petitioner was tried to a jury on a four count information charging possession with intent to sell narcotics (cocaine), General Statutes § 21a-278 (b); possession with intent to sell a controlled substance (cocaine) within 1500 feet of a school, General Statutes § 21a-278a (b); possession of narcotics (cocaine), General Statutes § 21a-279 (a); and possession of narcotics (cocaine) within 1500 feet of a school, General Statutes § 21a-279 (d). Evidence commenced on September 22, 2004, and on September 24, 2004, the jury returned a verdict of guilty on all four counts.

The conviction was affirmed by the Connecticut Appellate Court on July 18, 2006. *State* v. *Thomas*, 96 Conn. App. 578, 901 A.2d 76, cert. denied, 280 Conn. 912, 908 A.2d 542 (2006).

The facts upon which the guilty verdict was predicated are set forth, as follows, in the opinion of the Appellate Court:

"On July 23, 2003, at approximately 7:30 p.m., after receiving numerous calls concerning illegal drug activity outside 57 Belden Street in Hartford, members of the Hartford police department's vice and narcotics unit engaged in a surveillance of that location. The building at 57 Belden Street is within 1500 feet of Thomas J. Quirk Middle School, a public secondary school at which the [petitioner] was not a student. Among those conducting the surveillance were Officer Anthony Martinez and Detective Deborah Scates, who watched the front of the 57 Belden Street building from a parked, unmarked car approximately 100 yards away. Martinez and Scates observed three men, later identified as Craig Counsel, Julian Bernie, and the [petitioner] standing outside that location. Counsel, Bernie and the [petitioner] were all approached, approximately ten times

during the course of the surveillance, by what appeared to be drug-dependent individuals. Each individual who approached the three men would engage in a brief conversation with them outside the building and then would be escorted into the building by one of the three men, while the other two men remained outside as lookouts. Counsel, Bernie and the [petitioner] would take turns taking the individuals into the building or acting as lookouts. The [petitioner] entered the building twice with suspected drug-dependent individuals.

"On the basis of their training and experience, Martinez and Scates believed that the three men were using the hallway of 57 Belden Street to conduct narcotic sales and, therefore, sent a radio transmission to the other unit members to 'move in.' Upon approaching the [petitioner], Martinez saw him throw a plastic bag containing a white rock like substance underneath a motor vehicle. A chemist with the state toxicology laboratory later determined the substance thrown to be 25.1 grams of cocaine.

"At the time of arrest, the [petitioner] had $25 on his person, Counsel had $170 on his person and Bernie had $352 on his person. Additionally, Bernie dropped bags of narcotics when he stood up. Martinez and Scates testified that some drug dealers have one person hold the drugs and another hold the cash to minimize profit loss if they are stopped by police." Id., 579–81.

In his direct appeal, the petitioner challenged the admission of "uncharged misconduct" evidence at his trial. Accordingly, the Appellate Court opinion details additional facts relevant to its resolution of that appellate issue, as follows:

"The state filed a motion to introduce prior misconduct, and a hearing was held on that motion . . . . The [trial] court granted the state's motion, allowing the admission of two incidents of uncharged misconduct.

"Detective Alfred Henderson, with the major crimes division of the Hartford police department, testified concerning a February, 1999 incident. He testified that on February 19, 1999, at approximately 6:30 p.m., while he was checking the hallways of 57 Belden Street for illegal drug activity, he observed the [petitioner] standing in the hallway staring at the palm of his hand. In his hand, the [petitioner] was holding a plastic bag containing a white rock like substance, which Henderson immediately identified as crack cocaine and which later tested positive for cocaine. Henderson asked the [petitioner] to give him the plastic bag, and the [petitioner] complied. The [petitioner] also had $45 on his person. The [petitioner] and Henderson engaged in a conversation and the [petitioner] responded that 'he was selling to stay alive.' The [petitioner] told Henderson that the crack cocaine was worth approximately $200, and Henderson testified the amount of crack cocaine in the plastic bag was more than an amount typically carried for personal use.

"Detective Nathaniel Ortiz, with the Hartford police department's vice and narcotics division, testified concerning an incident that occurred on December 17, 2003. In response to numerous complaints from the property owner and residents, Ortiz and fellow officers executed a search and seizure warrant for 59 Belden Street, identifying Counsel as one of the targets and the [petitioner] as one of the associates. After announcing their presence and receiving no answer, the police forced entry into two apartments simultaneously. The [petitioner] and Counsel, who were in one of the subject apartments, left that apartment via the fire escape and attempted to enter the other apartment, but were detained by the police. The [petitioner] had a couple of 8-balls, which were one-eighth ounce chunks of crack cocaine, and $197 on his person. Ortiz testified that an 8-ball is not for personal use and that street level drug

dealers usually will carry at least one 8-ball and break off chunks to sell individually." Id., 581–82.

Regarding cautionary instructions relating to the admission of the "other crimes" evidence, the Appellate Court opinion indicates:

"During preliminary instructions to the jury, the court stated that some evidence might be admitted for a limited purpose only. After Ortiz testified, the court instructed the jury that his testimony was admitted for a limited purpose. The court instructed that his testimony was not being admitted to prove the bad character of the [petitioner], but could be considered only for the following limited purposes: (1) to show or establish the alleged intent of the [petitioner] to sell a controlled substance, namely, cocaine, which is an element of one of the crimes charged, (2) to show or establish that the [petitioner] knowingly possessed a narcotic substance, namely, cocaine, which is an element that the state must prove with respect to three of the crimes with which he is charged in this particular case and (3) to show or establish that the [petitioner's] presence at the scene of the alleged crimes was not merely coincidental, but rather that he was intentionally engaging in a system of criminal activity at that location. The court gave a similar limiting instruction at the conclusion of Henderson's testimony. At the close of evidence, the court again instructed the jury that the testimony of Ortiz and Henderson was not admitted to prove the [petitioner's] bad character or propensity to commit criminal acts, but was admitted for three limited purposes, which the court reiterated." Id., 582–83.

## I

## CRIMINAL TRIAL

## A

### State's Pretrial Motion

The state's pretrial motion to introduce uncharged misconduct evidence was heard September 15, 2004.

The state argued the marked similarities between the case about to go to trial and the two instances of uncharged misconduct: two of the three cases occurred at 57 Belden Street, and the third at 59 Belden; all three involved crack cocaine similarly packaged; and in two of the three cases, the petitioner was arrested with the same person, Craig Counsel. It was the state's contention that the similarities were indicative of common scheme or plan; further, that the two uncharged incidents tended to show the required intent to sell in the case to be tried, as well as knowledge that the substance was, in fact, cocaine.

The defense maintained that the uncharged matters were not sufficiently similar[1] and that the 1999 incident would not be probative of intent and knowledge due to remoteness.[2] It was the defense position that the potential prejudicial impact of the uncharged misconduct evidence outweighed its probative value in that, notwithstanding any cautionary instruction, the evidence might well be considered by the jury as indicative of the petitioner's bad character and propensity for criminal conduct.

The court, finding that probative value outweighed prejudicial effect, granted the state's motion,[3] observing that the state had to rely on circumstantial evidence to establish the elements of specific intent and knowledge (content of discarded bag); additionally, the state had

---

[1] Upon inquiry by the court, it was ascertained that there were no specific markings (or stamps) on any of the bags containing cocaine.

[2] The defense emphasized that the disposition in the earlier case was on a mere possession charge, not on a specific intent charge.

[3] The motion was granted subject to certain limitations: (1) with regard to the December, 2003 incident (search of apartments—59 Belden Street), any reference to weapons found was disallowed as overly prejudicial, although possibly relevant to a system of criminal activity; and (2) no reference to the mere possession conviction resulting from the February, 1999 incident, unless the defense wished to place before the jury the disposition by plea to an offense not involving intent to sell.

to show the petitioner's purpose while in front of 57 Belden Street (the building in which he resided) at the time of the underlying incident. With respect to a limiting instruction, it was stated: "I will be instructing the jury that they are to consider it solely for the purposes of proving intent to sell, knowledge that he possessed a narcotic substance and that he engaged in a system of criminal activity to sell drugs."[4]

## B

### Criminal Trial Evidence

Prior to the commencement of evidence, the court, in its preliminary instructions, delivered the standard "limited purpose" instruction to the jury.[5] Also, before any evidence, both counsel, on the record, outside the presence of the jury, indicated that they had received and reviewed the court's proposed limiting instruction on uncharged misconduct and had no objection to its terminology.

The state's first witness on September 22, 2004, was Officer Martinez, who, on direct, detailed the events leading up to, and resulting in, the petitioner's arrest on July 23, 2003. Initially, the testimony concerned his extensive experience and specialized training obtained while assigned for some ten years to the Hartford police department's vice and narcotics unit.[6] Officer Martinez

---

[4] It was indicated that the cautionary instruction would be given immediately after the uncharged misconduct testimony was presented and again at the conclusion of the evidence.

[5] Specifically, the court stated: "Some evidence may be admitted for a limited purpose only. When that happens, I will instruct you that an item of evidence, or some testimony, has been admitted for a limited purpose only and that you must consider it only for that purpose that I explain to you and for no other purpose." The court also gave, preliminarily (as well as in its final jury charge), the full, standard "police officer's testimony" instruction—testimony of a police officer is entitled to no special or exclusive sanctity merely because it comes from a police officer.

[6] The witness testified that he was a member of the Hartford police department for eighteen years, approximately ten of which were with vice and narcotics. He had Hartford Police Academy training in special tactics of

testified that on July 23, 2003, he worked the 5 p.m. to 1 a.m. shift as a member of a team of detectives investigating citizen complaints regarding narcotics activity at 57/59 Belden Street; his partner in the investigation was Detective Scates, and they were using an unmarked car. At approximately 7:35 p.m., the officers set up surveillance of 57 Belden Street from an empty lot on Albany Avenue, roughly 300 feet diagonally across from the subject building.[7] Their view of the building was virtually unimpeded, traffic on Albany Avenue was moderate, it was daylight, and the weather was clear and sunny. Officer Martinez testified, in detail, concerning the officers' observations from the surveillance location: the officers observed three individuals, including the petitioner, outside 57 Belden Street being repeatedly approached by suspected drug-dependent persons; after a brief conversation, one of the individuals would take the suspected purchaser inside the building while another of the three acted as the lookout; the individual and suspected drug-dependent purchaser were observed exiting the building after a short time;

arrest procedures, in pursuit procedures, in the enforcement of drug laws, and in the identification of different types of narcotics. The officer stated that he had participated over the years in numerous ("thousands") of investigations of illegal narcotics activity, resulting in the seizure of suspected illegal drugs and/or paraphernalia. He related his considerable experience in performing field tests of suspected substances and explained to the jury the workings of the val-tox test. The witness described, in detail, the different types of illegal drugs, and related how he could identify, through his training and experience, each type of substance seized or found. He also described, at length, the various methods used to "cut" or dilute narcotics for street sale, as well as the different and distinctive packaging of each of the drug substances. The witness had testified on numerous past occasions as an expert in the field of illegal narcotics activity, and was so qualified, without objection.

[7] Fifty-seven Belden Street is "almost a corner" building located near where Belden Street runs into Albany Avenue. Fifty-seven Belden Street is "connected" to 59; both buildings are four floor, multiresidential, having six apartments on each floor. According to the officer's testimony, the area is "a known narcotics area . . . people going there all the time looking for . . . narcotics or controlled substances . . . ."

and, immediately thereafter, the petitioner and his two companions briefly conversed. Based on their training and experience, the officers believed that the three individuals were using the hallway of 57 Belden Street to conduct narcotic sales inside the building.[8] Therefore, a decision was made "to have . . . [Officer Martinez] and members of the vice and narcotics unit . . . move in and detain those individuals to further [the] investigation."

As Officer Martinez reached the sidewalk in front of the building and proceeded toward Counsel, he observed the petitioner throw an object under a car parked at the curb; the officer was about ten feet away from the petitioner at the time he made this observation, and the object thrown appeared to the officer "to be a narcotic substance—[a] rock like substance."[9] Officer Martinez proceeded toward Counsel, detained him, found that he was sitting on bags of crack cocaine, removed those bags from where Counsel was seated, and placed him under arrest. While Officer Martinez was so engaged with Counsel, the petitioner was standing on the sidewalk, being detained by other detectives. After Officer Martinez secured Counsel, he then returned to retrieve the object he had observed the petitioner throw under the parked vehicle; the object he recovered from beneath the car was a plastic bag containing a white rock like substance which the officer, based on his training and experience, believed to be crack cocaine. A val-tox field test of the bag's contents yielded a positive reaction for cocaine, and the petitioner was placed under arrest. The petitioner, searched incident to the

---

[8] The officer testified that street dealers often use the common areas inside buildings as "cover from the police . . . [to] keep the citizens, residents, prying eyes away from their conduct."

[9] The officer testified that at the time he observed the petitioner throw the object under the parked car, both he and the petitioner were on the passenger side of the car.

arrest, was found to have $25 on his person. The contraband and the currency was brought by Officer Martinez to the Hartford police facility where it was held as evidence. The crack cocaine weighed approximately forty-two grams, or about two ounces; based on the amount of the cocaine and the manner in which it was packaged (twelve smaller bags inside one larger bag), it was Officer Martinez' opinion that it was for street sale, not personal use.[10]

On cross-examination, Officer Martinez was first questioned regarding the reason why he had gone in rank from a detective back to an officer.[11] The officer was then questioned, in detail, concerning the surveillance of 57 Belden Street. Photographs were entered into evidence depicting the view of the empty lot across Albany Avenue from the subject buildings in an effort to demonstrate that persons in the area of 57-59 Belden could have seen the police vehicles parked in that lot. It was brought out that the surveillance was initiated at 7:35 p.m. and continued for approximately one-half hour; that at a distance of some 300 feet, the officers claimed to have seen suspected drug-dependent persons entering the hallway at 57 Belden with either the petitioner, Counsel, or Bernie; that none of those presumed drug-dependent persons were ever stopped by the police, either in the area of 57 Belden, or within four or five blocks of the location; and that there was no confirmation by any member of the Hartford police department that any of the suspected drug-dependent

---

[10] Detective Martinez, based on his training and experience, estimated the street value of the cocaine to be "[m]aybe $800."

[11] The witness' explanation was as follows: "They wanted me to do investigation—they wanted me to do homicides . . . . Well, I could do it as a detective, but I couldn't make money going toward my pension. Basically, me giving up my detective badge, $5000 pay raise increased my pay to $50,000 more."

persons had, in fact, purchased drugs at 57 Belden Street.[12]

The cross-examination also brought out that when the surveillance team rushed across to the buildings, they all spread out, most going to secure the back of the building; that the area was "pretty well saturated with police officers," about eight in all, with Officer Martinez being the first to arrive at the front of 57 Belden. Officer Martinez proceeded to the individuals he was "targeting," Counsel and another individual standing in front of the building. According to the officer, as the police approached the building, the petitioner walked toward the vehicle; he did not run away. As the officer approached, he did not see anything in the petitioner's hand but saw an object leave his hand. He did not see the petitioner go into his pocket for anything. Through cross-examination, the defense sought to emphasize that with the considerable number of police officers on the sidewalk in front of 57 Belden, some in close proximity to the petitioner, it seemed unlikely that the petitioner would be throwing contraband to the ground.[13] Additionally, the witness could not remember any details concerning the parked vehicle: its color, the make, or kind of vehicle, etc.

Relative to the officer's credibility respecting the actions of the petitioner, the questioning of the defense attorney undertook to bring to the attention of the jury that in circumstances where an object (contraband) was abandoned (or thrown), the legal requirements upon which a patdown search must be predicated are

[12] The witness' explanation was that to have stopped any of the suspected drug-dependent persons would have given away the surveillance.

[13] Among a number of questions on this subject was the following:

"Q. So, he was aware that detectives were all around, and you're claiming that in the presence of all these detectives he tried to throw something away?

"A. Yes."

obviated, thereby removing any viable search and seizure issues.[14] The defense also questioned the witness on his seizure of rock cocaine that he testified fell from a chair in which a co-accused (Bernie) had been sitting and the consequent arrest of that individual.[15] It was also brought out that no fingerprint analysis was done on the object retrieved from under the parked car to see if the petitioner's prints were on the packaging, and, that only $25 was found on the petitioner's person. Further cross-examination, conducted without objection, pertained to any entry into the common areas of the building (57 Belden) by the detectives following the arrest of the petitioner and Bernie;[16] whether any

---

[14] Preceding these questions, reference was made to the officer's training in police procedures and drug enforcement. The officer was asked if as part of that training he had studied search and seizure law; he answered, "Yes."

[15] The witness testified on direct that it was Counsel who was sitting in the chair; on [cross-examination], when asked if it was Bernie or Counsel, the officer, after reviewing his report to refresh his recollection, stated, "Mr. Bernie was sitting in the chair." The attorney continued with the questioning:

"Q. And when Mr. Bernie stood up, did you see anything happen with regard to narcotics?

"A. Yes. I recovered—

"Q. And what was that?

"A. Bags of crack cocaine fell from his person from underneath the chair, around that area when he stood up.

"Q. So, these drugs just happened to fall out from his lap?

"A. Where they came from, sir, I don't know. It came from his person, though. I don't know if he was sitting on them or he had them in his hand and he tried to drop them, but when he stood up, also the drugs fell to the ground.

"Q. They just happened to fall to the ground. That's correct?

"A. They just happened to fall to the ground. . . .

"Q. So, you didn't have to search Mr. Bernie to find any drugs?

"A. No."

[16] The following areas of cross were in anticipation of testimonial evidence to be presented by the defense and were tied in later during the presentation of its case:

"Q. After Mr. Thomas and Mr. Bernie, and the third person were arrested, do you know if any members of your team . . . went into the hallway at 57 Belden Street?

"A. That's a good possibility, sir . . . more than likely, yes, looking for, weapons and other individuals that's involved.

members of the team went upstairs to the fourth floor;[17] whether any occupied apartments at 57 Belden were searched at the time of the incident, specifically an apartment on the fourth floor;[18] and, whether, the police would go into the apartment of somebody who had just been arrested downstairs.[19] Officer Martinez was also cross-examined regarding his observations during the surveillance, specifically, whether he saw any children playing in the street at that time, and/or if the petitioner was observed playing football in the street with some children.[20]

The redirect examination of the witness centered on the following points: the focus of the investigation, which resulted from citizen complaints, was on dealers,

"Q. Or looking for contraband?

"A. Contraband, weapons, everything."

[17] To this inquiry, the witness answered: "That I do not know."

[18] The cross-examination proceeded, in part, as follows:

"Q. . . . [W]ere any occupied apartments searched?

"A. With residents in them?

"Q. Or they may—maybe no one was home, but still rented.

"A. That I do not know, sir. . . .

"Q. Is it common procedure to go inside the building . . . and to go into apartments?

"A. Yes. It depends. What you're asking me, apartments, as far as people living in them, or abandoned apartments, what are you asking me?

"Q. People living in them.

"A. It depends, sir."

[19] To this inquiry, the witness answered, "No."

[20] This line of questioning, too, was anticipatory of witnesses who later would be testifying for the defense. Questions on [cross-examination] were directed to the officer, as follows:

"Q. Did you see [the petitioner] playing football in the street with some children?

"A. No.

"Q. Did you see any children playing in the street during your surveillance?

"A. My attention was basically focused on the individuals in front of the building.

"Q. So, does that mean that [the petitioner] may have been playing in the street but you didn't see him?

"A. Yes."

not suspected purchasers; arresting suspected purchasers at or around 57 Belden Street would have run the risk of detection of police presence, and frustration of the investigation; no need existed to fingerprint the thrown bag of cocaine since it was observed leaving the hand of the petitioner; the officer had observed persons throw or drop narcotics numerous times with police officers nearby, presumably under the belief that criminal culpability cannot be easily established if the contraband is not found on one's person; the petitioner and the other individuals were all placed under arrest and, then, searched incident to their arrests; the witness was aware, based on his training and experience, that drug dealers often have another person holding the money so as not to lose the profits from drug sales if stopped by the police; and, the officer had no knowledge of other officers entering the building after the arrest of the three individuals.[21]

Detective Scates testified that on July 23, 2003, she worked as Officer Martinez' partner on the 57-59 Belden Street narcotics investigation. At the time of trial, she had been a member of the Hartford police department for eight years and a detective for approximately one and one-half years; she was assigned to the vice and narcotics division. Detective Scates had substantially the same training and experience as Officer Martinez with respect to vice and narcotics investigations.[22] She was qualified, without objection, as an expert in the field of narcotics activities.

[21] The recross-examination emphasized, primarily, that where contraband is reported as having been thrown or dropped to the ground, it generally would be viewed as abandoned, and search and seizure issues would be substantially minimized in the prosecution of the case.

[22] Additionally, Detective Scates testified that while a member of the Hartford police department she had previously been assigned for one year with the chief state's attorney's office as an undercover narcotics officer working with the gang task force.

Detective Scates testified that on July 23, 2003, she worked the B shift—from 5 p.m. until 1 a.m. As with the preceding witness, her assignment was to participate in the narcotics investigation at 57-59 Belden Street, which was initiated resulting from citizens, tenants, and the rental company complaints. She, too, engaged in the same surveillance, as previously described, from the abandoned lot diagonally across Albany Avenue from 57-59 Belden.[23] When the team members approached the building, following the stated observations, Detective Scates and her partner went directly to the sidewalk in front of the building where she approached Counsel, with whom she "had dealings with in the past." At that time, the detective observed the petitioner standing on the sidewalk in front of the building.

At the scene, marijuana and currency were found on the person of Counsel and, as stated, currency was seized from the petitioner. Also, at the scene, Detective Scates observed a bag of crack cocaine being retrieved by Officer Martinez "[f]rom a curb under a vehicle."[24]

On cross-examination, the defense attorney went over the specifics of the surveillance: where the detectives' vehicle was located, the distance of the abandoned lot from 57 Belden Street, and what could be seen looking back from the front of 57 Belden toward

---

[23] The witness testified that she and her partner were sitting in a vehicle with a clear view of the front of the buildings, it was still light, and there was nothing obstructing their view. They observed individuals standing outside the front entrance to the multifamily building, one such individual sitting in a chair; suspected drug-dependent persons would approach one of the individuals, following a brief conversation they would enter the building, and, shortly thereafter, they would exit the building, the suspected drug-dependent person then leaving the area. This occurred ten or eleven times prior to the decision to "move in"; that is, to approach the building. Detective Scates testified that she saw the petitioner enter and exit the building with a suspected drug-dependent person two times.

[24] At trial, Detective Scates identified state's exhibit #1 as "the crack cocaine that was retrieved from underneath the vehicle and tagged and seized as evidence on that day."

the lot. It was brought out that Detective Scates' attention was focused on Counsel, rather than on the petitioner, as she approached the building, and, that she did not see the petitioner throw anything. The detective testified that she did not go into 57 Belden Street, did not see other members of the team go into the building, did not know if the building's front hallway was searched, and did not know if any of the police officers went up to the fourth floor; further, that she did not see anyone, including children, playing in the street near 57 Belden.

The state concluded its case-in-chief with the testimony of the uncharged misconduct (other crimes) witnesses, Detectives Ortiz and Henderson.[25] Detective Ortiz testified that he had been a member of the Hartford police department for eight years and was currently

---

[25] Two other witnesses testified for the state: James Paggioli, a survey supervisor with the city of Hartford, and Rafal Mielguj, a chemist/toxicologist from the department of public safety laboratory. Paggioli testified that he was a licensed land surveyor with the Hartford department of public works and prepared a scale map, entered into evidence as state's exhibit #3, depicting a radius of 1500 feet around the Thomas J. Quirk Middle School at 85 Edward Street and showing the subject properties (57/59 Belden Street) within that radius. Fifty-seven Belden measured 610 feet from the school building, and 410 feet from the school property. The parties stipulated (1) that on July 23, 2003, the petitioner was not enrolled as a student at the Quirk school and (2) Quirk school is a public secondary school located at 85 Edwards Street.

Mielguj testified that he had been employed as a chemist with the state toxicology laboratory for one year, previously having been employed, in the same capacity, with the state department of health. He testified as to his educational background (undergraduate and graduate degrees in organic and analytical chemistry), as well as extensive experience in substance analysis; after further testifying regarding laboratory procedures employed upon the submission of evidence, and the various tests utilized to qualitatively identify substances, the witness was qualified, without objection, as an expert in the field of "chemical analysis of suspected illegal substances." Mielguj identified the bag previously admitted as exhibit #1, described the tests he had performed on its contents and stated that the substance was cocaine. The witness described the manner in which it was packaged as "tied plastic bags . . . ." He testified, both on direct and [cross-examination] that the weight of the substance was 25.1 grams, not forty-two grams.

assigned as a detective to vice and narcotics, having been in that division for about two years. He testified as to his police academy and on the job training, with specific reference to the identification of illegal substances and the conducting of narcotics investigations. He referred to extensive experience in the execution of search and seizure warrants, the field testing of narcotic substances, and the packaging of the various types of narcotics. The detective was qualified, without objection, as an expert in the field of illegal narcotics activities.

Detective Ortiz testified that on December 17, 2003, he was assigned to the vice and narcotics division, working the evening shift. He was part of a team of officers executing a search and seizure warrant at 59 Belden Street; the targeted apartments were B-2 and C-2, and the targeted individuals included the petitioner and Counsel.[26] As his team approached C-2 they "knocked and announced," heard people inside scurrying around, and, since the door was not opened by those inside, a forced entry was effectuated. The petitioner and Counsel ran out onto a fire escape attempting to go into another apartment; both were detained, secured, and brought back inside. The petitioner had "at least a couple of 8-balls" of crack cocaine on his person; according to the witness, an "8-ball" is not for personal use—it is "usually for street level drugs, they will at least carry about an 8-ball . . . [t]hey break off chunks of it to sell pieces individually." One hundred ninety-seven-dollars was also found on the petitioner's person; the detective testified: "[b]y his own admission, he had no job."[27] The petitioner was placed under arrest.

[26] The detective stated that he had received numerous complaints from the property manager and the residents of narcotics and firearms activity at 59 Belden.

[27] The witness indicated that Counsel also had crack cocaine and money on his person.

On cross-examination, it was emphasized that when the officers entered the apartment, persons other than the petitioner were observed "trying to flush stuff down a toilet;" that the petitioner, when brought back inside the apartment, was cooperative; during the incident the petitioner was not observed "trying to throw anything away"; and that since the witness' report did not state how much cocaine was found on the petitioner's person, he could not be sure of the quantity.

Consistent with its pretrial ruling on the state's motion to introduce uncharged misconduct evidence, the court, at the conclusion of Detective Ortiz' testimony, delivered a comprehensive cautionary instruction regarding the limited purposes for which the evidence was admitted.[28]

---

[28] The court's cautionary instruction included the following: "I told you with my preliminary instructions that there might be some evidence that's only admitted for a limited purpose and if that was the case I would be giving you a limiting instruction telling you for what limited purpose you could consider evidence . . . . [T]he testimony that you just heard from Detective Nathaniel Ortiz is one such instance of evidence only being admitted for a limited purpose, so, I'm going to tell you about . . . [the] . . . limited purpose you can consider his testimony.

"What you heard from Detective Ortiz was evidence of a subsequent act of alleged misconduct by the [petitioner], which may or may not allegedly constitute an uncharged offense. And you've heard that evidence today in addition to a lot of evidence from the state of the actually alleged conduct which has been offered to support the state's allegations in the four counts with which [the petitioner] is charged. . . .

"This evidence of other alleged subsequent misconduct on the part of the [petitioner], an act for which he is not on trial here today, is not being admitted to prove the bad character of the [petitioner] or the [petitioner's] tendency to commit criminal acts. It's not admitted to prove that he committed the specific four crimes charged in the information . . . . The evidence is only being admitted for several limited purposes; (1) to show or establish the alleged intent of the [petitioner] to sell a narcotic controlled substance, namely, cocaine, which is an element of two of the crimes charged, the crimes charged in the first two counts of the information, and those crimes as you will recall are possession of a narcotic with intent to sell, and possession of a controlled substance with the intent to sell within 1500 feet of a school.

"The second limited purpose for which Detective Ortiz' testimony has been offered is to show or establish that the [petitioner] knowingly possessed

Detective Henderson testified he had been a member of the Hartford police department for ten years, had been a detective since 1999, and was currently assigned to the major crimes division. Prior to major crimes, he was assigned to vice and narcotics for five years. The witness indicated that he had extensive training and experience in narcotics investigations, had made "hundreds" of arrests in connection with such investigations, had performed numerous val-tox tests, had participated in the execution of numerous search warrants, and was very familiar with drug identification and packaging. The detective was qualified, without objection, as an expert in illegal narcotics activity.

The witness testified that he worked the second shift on February 19, 1999—"[q]uarter to three to quarter to eleven and quarter to four to quarter to twelve." He was assigned, in uniform, to the north public service area, a proactive police department unit which checks corners, hallways, etc., for loitering, drug transactions, etc. While in the area of 57/59 Belden Street, at about 6:30 p.m., the witness, with his partner, exited the cruiser and entered the hallway of 57 Belden, where he observed the petitioner looking down at an object he was holding in the palm of his hand. The lighting in the hallway was "pretty good," and the witness

a narcotic controlled substance, namely, cocaine, which is an element that the state must prove with respect to all four of the crimes . . . charged . . . .

"The last and final purpose that the state is offering the testimony of Detective Ortiz is to show or establish that the [petitioner's] presence at the scene of the alleged crime, the vicinity of 57 Belden Street, on or about July 23, 2003, was not merely coincidental but that he was intentionally and knowingly engaging in a system of criminal activity in that vicinity.

"You may not consider such evidence as establishing a predisposition on the part of the [petitioner] to commit any of the crimes charged or to demonstrate a criminal propensity. You may consider Detective Ortiz' testimony if you believe it, and further find that [it] logically, rationally and conclusively supports the three issues for which it is being offered by the state, but only as it may bear here on those three limited purposes . . . ."

observed that the object was "a plastic bag with several pieces of a rock like substance in the bag"; based on his training and experience, the witness identified it as crack cocaine. The witness told the petitioner to give him the bag, and it field tested positive for cocaine. The petitioner told the detective that "he was selling to stay alive." Also found on the petitioner's person was a small amount of cash; because of the quantity of cocaine, its value, and the manner in which it was packaged, the witness, based on his training and experience, was of the opinion that it was not for personal use, but for sale.

The cross-examination stressed that when the uniformed officer asked the petitioner for the object, he immediately handed it over and did not try to throw anything to the ground or out of the detective's sight; further, that at the time, there was no one else with the petitioner; and, that the incident occurred "over five years ago . . . ." The defense also brought out that with respect to the petitioner's saying that he sold "to stay alive," no written or sworn statement was ever taken from him. The cross-examination also clarified, from the report, that the amount of money the petitioner had on his person was $45.

Upon the state's resting,[29] the defense presented two witnesses: Andrea Montero and Marcus Cruz. Montero

[29] After the state rested, the court heard arguments on defense counsel's oral motion for a judgment of acquittal. The defense argued that the jury could not reasonably find the element of possession proven beyond a reasonable doubt, emphasizing that only Officer Martinez testified to seeing an object leave the petitioner's hand, and, that some time later he was the one who retrieved it from under the parked vehicle. The attorney noted that Detective Scates did not see the petitioner throw any object and that "she was certainly right there." The assistant state's attorney maintained that the testimony of Officer Martinez established possession and that the credibility of the testimony was for the jury to determine. The court denied the motion for a judgment of acquittal, stating: "It's the quality of the testimony that the jury assesses, not the quantity. . . . Although Scates didn't see the [petitioner] throw it, she did notice that it was under the car. It was later retrieved. So, that buttresses Mr. Martinez' testimony, viewing it in a light

stated that she had lived at 57 Belden Street, apartment A-4 (fourth floor), for seven years directly across the hall from the petitioner; further, that she knew the petitioner for approximately the same duration and that he is the father of one of her children. At around 7:30 p.m., on July 23, 2003, her eleven year old son, Marcus Cruz, was playing football with the petitioner in the street in front of 57 Belden; a neighbor from the second floor came upstairs and told her that the police were frisking her son. Montero went to the window and told the officers to leave her son alone, as he was only eleven. She observed the petitioner, Counsel and Bernie all handcuffed, and the police officers with keys, which, according to the witness, were obtained by the police from the pockets of the three detained individuals. Two of the officers then entered the building; ten or twelve minutes later they came out of the building, and one stated that they had found something. At some point, the witness' young son, Marcus, had returned to the apartment. Montero heard footsteps in the hallway and upon opening her door, and later looking through the peephole, observed officers entering, and rummaging through, the petitioner's apartment. After about twenty minutes, the officers left, leaving the door to the apartment ajar. The witness observed the petitioner and the other two individuals being placed in the cruiser(s) and taken from the scene.

The cross-examination centered on the witness' past relationship with the petitioner, that she would not want to see her daughter's father incarcerated, that she could not recall which officer actually searched the petitioner and removed his keys, and her questionable ability to observe through the peephole the activities about which she had testified.

most favorable to the state. I think that there is sufficient evidence here to take the issue of possession to the jury."

Marcus Cruz testified that he was twelve years old, a seventh grade student at Quirk Middle, and aware that one would "get in trouble" for not telling the truth; he stated that his mother told him "to tell the truth"; further, that he lived at 57 Belden Street, knew the petitioner, and recalled the events which occurred in the early evening of July 23, 2003. Around 7 and 7:30 p.m., Marcus and the petitioner were playing football in the middle of Belden Street with two of Marcus' friends; this continued for about twenty minutes, and then Marcus went and sat in the chair between 57 and 59 Belden, at which point he observed the petitioner standing in front of his building—57 Belden. Next, the police officers "rushed through the back," "stood [Marcus] up," and "started checking [him]"; he was then told to leave. He observed other officers searching the petitioner, handcuffing him, and then having him sit on the ground with two other men. While Marcus continued to sit outside with his two friends, he saw three officers enter the front of 57 Belden Street and then exit the building three or four minutes later; as they exited the building, an officer had something in his hand, but the witness could not identify the object. After that officer came out, he shouted something. Thereafter, the petitioner and the other two handcuffed individuals, all of whom had been sitting on the curb, were placed in the cruiser(s).

On cross-examination, the witness testified that he had known the petitioner for a number of years ("[for the same amount I've been living there"), saw him "a lot around the building," and considered him "a friend . . . ." Additionally, the witness stated that he did not know all the people in 59 Belden, did not know Counsel, did not know the two others on the curb with the petitioner, and did not see the officers take anything from the petitioner's person. Also, Marcus indicated that while he observed the three officers enter and, a few

minutes later exit, 57 Belden, he had no knowledge regarding what the officers did inside the building. On redirect, the witness, in response to counsel's question, stated that he would not lie for the petitioner.

Upon resting,[30] defense counsel renewed the motion for a judgment of acquittal. The defense contended that the testimony of its two witnesses, Montero and Cruz, coupled with the prior testimony, would not reasonably permit a finding of guilty beyond a reasonable doubt. The assistant state's attorney argued that even if the defense evidence was accepted as credible in its entirety, none of it would directly challenge the evidence presented by Officer Martinez that he saw the petitioner throw the object under the car and that he retrieved it, and, the testimony of Detective Scates that she saw Martinez retrieve the object. The court, in denying the renewed motion for a judgment of acquittal, repeated that assessing the credibility of witnesses, and drawing inferences from facts testified to, is a province exclusively reserved for the jury.

## C

### Summations

In its opening summation, the state, referring to the elements of possession, knowledge, and intent to sell, directed the jury's attention to the testimony of Officer Martinez and Detective Scates regarding the throwing and retrieval of exhibit #1, to evidence relating to the packaging of the cocaine, and to the quantity of the drug. The assistant state's attorney pointed out that the Martinez/Scates testimony constituted direct evidence relating to possession and, together with other evidence, supported a reasonable inference of knowing possession.

---

[30] The petitioner did not testify at the criminal trial. At the completion of the defense case, the state indicated that it would be offering no rebuttal evidence.

With regard to knowing possession, the attorney told the jury: "[T]here was also the testimony of Detective Ortiz and Detective Henderson. . . . [T]he court gave you an instruction regarding the testimony of those two detectives. . . . Their testimony was offered in order for you to make a determination as to whether or not the [petitioner] knew what he possessed was cocaine. You heard the testimony of Detective Ortiz that five months after . . . July 23, 2003 . . . at 59 Belden . . . right next door, this [petitioner] . . . [w]as again arrested and at the time [the] officers caught him he possessed a white, rock like substance. You also heard Detective Henderson testify that [on] February 19, 1999, again at 57 Belden . . . four years prior, he walked into the hallway . . . saw the [petitioner] looking at a white, rock like item in his hand. . . . Ladies and gentlemen, you can use the testimony of Detectives Ortiz and Henderson in determining whether . . . the [petitioner] knew . . . on July 23, 2003 . . . what he tossed under the vehicle in view of Officer Martinez was, in fact, cocaine."

Concerning the element of intent to sell (counts one and two), the assistant state's attorney emphasized the evidence pertaining to the manner in which the cocaine was packaged and evidence on the amount/weight of exhibit #1. The attorney went through in detail the testimony of Officer Martinez and Detective Scates, both of whom were qualified as experts in narcotics investigations, regarding the manner and significance of the packaging, as well as the quantity. Reference was then made to the Henderson/Ortiz testimony, as follows: "[H]ow else can you find [out] what the [petitioner's] intent was on July 23, 2003? . . . [Y]ou can use the testimony of Detective Henderson. When he arrested the [petitioner] on February 19, 1999 . . . 57 Belden, the same location, saw him looking at that object in his hand and the [petitioner] told you what his intent

was. He said he sold drugs to stay alive. And you can use that testimony to find that on July 23, 2003, his intent was also to sell those drugs. . . . Furthermore, Detective Ortiz testified that in December of 2003 officers were executing a search and seizure warrant at 59 Belden Street. . . . [A]lthough the [petitioner] was very cooperative after he tried to run out of the apartment, he also had crack cocaine on him, but not only that . . . he had money. . . . And that's what this all comes down to. . . . [The petitioner's] intention was to make money."

With reference to the two defense witnesses, the assistant state's attorney emphasized that the subject matter of their testimony concerned what occurred after the petitioner possessed the crack cocaine. The attorney stated: "[W]hatever you make of that testimony, the state submits that what is most important is the fact that when Officer Martinez approached on foot, he saw the [petitioner] throw a bag containing twelve smaller bags of crack cocaine under the car. Whatever may or may not have happened, depending on what you find concerning the testimony of Ms. Montero and her son, does not change what Officer Martinez testified to, that when he approached on foot, this [petitioner] threw a bag under a car. It was recovered, and it contained crack cocaine and it was packaged, according to the experts, for sale."

The defense summation initially addressed the surveillance testified to by Martinez/Scates, with counsel questioning, on the basis of defense exhibits A and B, whether the officers were positioned such that they could see those events they testified were taking place in front of 57 Belden. Counsel pointed out that the officers were unable to identify any of the suspected purchasers; that although there were some eleven such suspected persons, the petitioner entered the hallway only twice; the officers never observed any actual sales

of narcotics; none of the eleven such persons were stopped off-site to determine if they were in possession of recently purchased drugs; and the police did not send an undercover person into 57 Belden to attempt a purchase and thereby confirm that drug sales were taking place. With regard to the petitioner's throwing exhibit #1 under the car, defense counsel argued that it was unlikely the petitioner would do so in the sight of, and in very close proximity to, the several police officers; also, consistent with his inquiries on cross-examination, counsel stressed that exhibit #1 had not been subjected to any fingerprint analysis, and, with respect to any dealing, the petitioner had only $25 on his person.

Concerning the other crimes Ortiz/Henderson testimony, the defense attorney emphasized that neither the prior nor the subsequent incident involved the petitioner trying to discard or throw away contraband. The attorney reminded the jury that the judge had instructed on the limited purposes for which the evidence could be considered and that it could not be used to prove that the petitioner committed the crimes charged. Regarding the Ortiz testimony that the petitioner possessed crack cocaine at the time of the December 17, 2003 execution of a search warrant, the attorney stressed that the witness could not remember the quantity and apparently did not have the amount in his report. As to the Henderson testimony, counsel brought out that when the petitioner was observed with the cocaine in his hand, he made no effort to conceal it—he "accepted it"; and, further, that the "sell to stay alive" comment was not contained in a written and/or sworn statement of the petitioner. The attorney also emphasized that the incident which was the subject of the Henderson testimony occurred over four years prior to the July 23, 2003 incident for which the petitioner was on trial.

The defense attorney concluded his summation detailing the testimony of Montero and Cruz. He called the jury's attention to the observations made by the defense witnesses: the petitioner and the other two individuals handcuffed and seated on the curb; officers then entering 57 Belden; within a few minutes, the officers exiting the building, one of them holding something in his hand and shouting something; and, then, the petitioner and the other two being placed in the cruiser(s) and taken to the police station. The attorney argued that from the facts testified to, a reasonable inference could be drawn that the cocaine came from inside the building. Counsel's argument suggested that if such inference was drawn, it, in conjunction with the entire evidence, would give rise to a reasonable doubt as to whether, as the police approached, the petitioner possessed, and discarded, cocaine.

In rebuttal, the state made one brief, initial reference to the petitioner's engaging in "the system of criminal activity" and then dealt specifically with most of the salient points raised in the defense summation. The assistant state's attorney reminded the jury that the police, according to the evidence, did not stop any of the suspected drug purchasers, on or off-site, because they did not want to "give away their surveillance position . . . ." With reference to not sending in undercover personnel to attempt a purchase of narcotics, the state argued that the police went to the immediate area of the Belden Street buildings in response to, and acting upon, citizens' complaints of narcotics activity and, accordingly, set up the surveillance. Concerning Detective Scates not seeing the petitioner throw exhibit #1, the jury was asked to recall that when the officers approached the building(s), each had his or her assignment, and Scates' target was Counsel; she was focused on Counsel, not on the petitioner. As to there having been no fingerprint analysis, reference was made to

Martinez' testimony that attempts to lift fingerprints from packaged narcotics normally are not made where the officer saw a defendant in possession of the drugs and can testify to that fact. With regard to the prior 1999 incident testified to by Henderson, the assistant state's attorney stated that there had not been time to discard the possessed cocaine; respecting the petitioner's admission to Henderson ("sell drugs to stay alive"), she then stated: "Use your common sense to see if that proves what the [petitioner's] intent was here on July 23, 2003. February of 1999 isn't on trial. December of 2003 isn't on trial. What is on trial is July 23, 2003, 7:30 at night. What Officer Martinez and Detective Scates observed. But you can use the evidence from Detective Henderson and Detective Ortiz to try and determine what the [petitioner's] intent was on July 23, 2003." As to the quantity of cocaine (exhibit #1), the state acknowledged the discrepancy between the weight testified to by Officer Martinez, forty-two grams, and that testified to by the chemist/toxicologist from the department of public safety toxicology laboratory, Rafal Mielguj, twenty-five grams. The assistant state's attorney argued that Mielguj had sufficiently explained the discordant testimony as to weight by informing the jury that narcotics can break down over time and that moisture causes narcotics to disintegrate; additionally, the attorney referred to a portion of the Henderson testimony, as follows: "Even assuming that it's twenty-five grams, as I said in my first closing, it's still fifty times the amount, Detective Henderson told you, is for personal use . . . [e]ven assuming it's twenty-five [grams] and not forty-two." The assistant state's attorney further addressed intent, emphasizing the packaging: "But I submit to you, that you can find credible Detective Martinez' testimony that at the time that it was seized it was forty-two grams, Mr. Mielguj's testimony was that it was twenty-five grams. Mr. Mielguj explained

why that can happen, but more important than that, ladies and gentlemen, the packaging. . . . Twelve individual bags, knotted off. You can look at it. You'll have it with you."

The state's rebuttal summation concluded with counsel questioning the credibility of the two defense witnesses on the basis of the manner in which it was claimed the observations were made, their relationship with the petitioner, and the substance of the testimony. The attorney concluded her discussion of the evidence, stating: "The [petitioner] would have you infer that because officers went in and came out and one had an object in their hand that, in fact, logically, there's a reasonable doubt, that the [petitioner] didn't throw the bag. But, ladies and gentlemen . . . [a]ll of that happened later. All of that happened later. If you believe the testimony of those two witnesses, and that's for you to decide based on what they said and what their interests are, if you believe it, it still doesn't change the testimony of the state's witnesses."

## D

### Charge

The court gave the standard boilerplate instruction regarding its reference to any evidence: "If I refer to any of the evidence in this charge, and I will do so briefly, it will be simply for the purposes of illustration and clarification, and you're not to understand that I intend to emphasize any evidence that I mention or limit your consideration to that evidence alone. . . ." Similarly, the court gave the standard charge on police officer testimony, specifically referencing Martinez, Scates, Ortiz, and Henderson: "As you will remember, there was testimony here from Anthony Martinez, who identified himself as a Hartford police officer and former detective, and [Scates, Ortiz, and Henderson], who identified themselves as Hartford police detectives. The

testimony of a police officer, again, is entitled to no special or exclusive sanctity merely because it comes from a police officer. A police officer who takes the witness stand subjects his or her testimony to the same examination and the same tests as any other witness does. And in the case of a police officer, you should not believe nor disbelieve him or her merely because he or she is a police officer. . . . [Y]ou should weigh and balance that testimony just as carefully as you would weigh the testimony of any other witnesses." Furthermore, it was made abundantly clear to the jury that the case was to be decided just on the evidence and that the closing arguments of the attorneys did not constitute evidence.

The court also charged on expert testimony, clearly informing the jury that while any expert opinion must be considered, it is not binding: "Officer Martinez, Detectives Scates, Ortiz and Henderson of [the Hartford police department], and Rafal Mielguj, a chemist at the state toxicology . . . stated . . . not merely what they knew as facts, but they gave opinions as experts. . . . No matter what may be the expertise of a particular witness who states to you an opinion . . . that opinion is subject to review by you. It is no way binding upon you. It is for you to consider along with the other circumstances in the case, and using your best judgment, to determine whether or not you will give any weight to it, and, if so, what weight you will give to it."

The court instructed on the meaning of "inferences," explained circumstantial evidence, charged on knowing possession, and delivered the standard, detailed intent instruction. With respect to specific intent to sell, the court charged, in part: "You may consider the quantity and the quality of the narcotic substance found in determining the element of intent to sell, as well as the nature of its packaging, and other evidence presented that you choose to find credible, and from these facts

the jury may draw an inference, if it chooses to, of possession with intent to sell, provided that you find in accordance with my previous instructions on intent and circumstantial evidence."

As stated, the court again instructed on the limited purposes (intent to sell; knowing possession of cocaine; and, presence at the scene not merely coincidental) for which the other, uncharged crimes evidence was admitted and could be considered by the jury. The jury was instructed: "This evidence of other alleged misconduct . . . acts for which he is not on trial, is not being admitted to prove the bad character of the [petitioner], or the [petitioner's] tendency to commit criminal acts. It's not admitted to prove that he committed the specific crimes charged in this case. Such evidence is only being admitted for . . . [the] limited purposes. . . . You may not consider such evidence as establishing a predisposition on the part of the [petitioner] to commit any of the crimes charged or to demonstrate a criminal propensity. You may consider this evidence if you believe it, and further find it logically, rationally, and conclusively supports the issues for which it is being offered by the state, but only as it may bear here on the three limited purposes . . . . On the other hand, if you do not believe such evidence, or even if you do, if you find that it does not logically, rationally, and conclusively support the issues for which it is being offered by the state, namely, the three limited purposes . . . then you may not consider that testimony for any purpose."

## E

### Verdict

A verdict of guilty was returned on all counts on September 24, 2004.[31] A presentence investigation was

---

[31] It appears from the transcript that the jury deliberated for approximately an hour, and the only note received was that informing the court that a verdict had been reached.

ordered, and the case was continued to December 6, 2004, for sentencing.

F

Postverdict

Defense counsel filed a motion for new trial on October 25, 2004. The motion recited that the defense had become aware "through newspaper and television reports that Detective Nathaniel Ortiz, who testified for the State . . . is now the subject of an internal affairs investigation at the Hartford Police Department for making false statement(s) to a judge in a search warrant application." Both the motion and the brief state that Detective Ortiz testified as a subsequent misconduct witness, his testimony was referenced by the assistant state's attorney in closing argument, the court instructed the jury regarding this evidence, and the petitioner was "denied a fair trial." A hearing on the motion was held on November 15, 2004; on that date defense counsel filed a supporting memorandum of law. The motion was opposed by the state on multiple grounds, including untimeliness and, after lengthy oral argument, the motion was denied on that ground and on the procedural basis that a newly discovered evidence claim is properly asserted on a petition for a new trial pursuant to General Statutes § 52-270.

G

Sentencing

Following the conducting of a presentence investigation, and the filing of a presentence report, the sentencing proceeding was held on December 6, 2004.[32]

---

[32] The transcript in evidence [exhibit #9] does not indicate the arguing of any postverdict motions on that date.

## II

## CIVIL TRIAL—INSTANT PETITION

The trial on this petition was quite brief. The petitioner called one witness, his defense attorney at the criminal trial;[33] the respondent, the state of Connecticut, did not present any testimony. A number of documents were admitted as the petitioner's exhibits: transcripts of proceedings from jury selection through sentencing [exhibits #3, 4, 5, 6, 7, 8, and 9]; transcript of the Henderson nolo contendere plea proceeding [exhibit #12]; transcript of Ortiz sentencing proceeding [exhibit #14]; pages sixty-eight through seventy of the court's charge to the jury [exhibit #1]; Hartford police department, internal affairs division, investigative funds disbursements statement from December 29, 2005, back through September 1, 2000 [exhibit #2]; certified copy of information(s) with docket entries showing October 26, 2007 felony conviction of Henderson [exhibit #10]; certified copy of Henderson arrest warrant affidavit, January 9, 2006 [exhibit #11]; certified copy of substitute information with docket entries showing April 8, 2008 false statement in the second degree conviction of Ortiz [exhibit #13]; and, certified copy of Ortiz arrest warrant affidavit October 22, 2004 [exhibit #15]. The court took judicial notice of the court file in the criminal case.

Attorney Jeremy N. Weingast testified as to his professional background;[34] he stated that he represented the petitioner in this case and in other pending cases going back to "about 2002 or 2003." The attorney filed motions for discovery (which included a request for exculpatory information) and a bill of particulars; pursuant to the open file policy of the state's attorney's

---

[33] The petitioner did not testify.

[34] Weingast was admitted to the bar in 1975, was an assistant state's attorney, Superior Court, judicial district of Hartford, for approximately eight years, and has practiced law in Hartford for the past twenty years, with criminal defense as a primary area of practice.

office, attorney Weingast had access to the state's file and had the police and laboratory reports. He did not subpoena personnel or internal affairs division files of any of the police witnesses prior to, or during, the trial because he could not satisfy the threshold requirement.[35] Following the verdict, and before sentencing, the attorney learned of the "falsifying of reports [and] related misdeeds" on the part of Detective Ortiz and, based on that, he filed the motion for new trial, which, as stated, was denied, the court indicating that a § 52-270 petition would be the more appropriate means to pursue the issue. Attorney Weingast felt, given the facts of the case,[36] that evidence of the alleged misconduct of Ortiz, and that witness' October 22, 2004 arrest, would bear on the credibility of the other crimes testimony; would not have been merely cumulative; and, had it been available, the attorney would have undertaken to use such evidence to attack the witness' credibility.[37] Attorney Weingast continued to represent the petitioner through sentencing and the sentence review hearing.

Documentary evidence presented at the trial on this petition established the following facts. A warrant for the arrest of Ortiz was signed by Judge Espinosa on

[35] The attorney testified, in answer to a question regarding meeting the threshold showing, as follows: "Right. At that point I had no reason to think that there was anything there that would have affected this case."

[36] The attorney testified: "If I can elaborate, the allegation in the case was that an officer claimed that he saw [the petitioner] throwing what turned out to be a bag containing narcotics under a car that was parked by the curb. And it was the defense's contention, and there was testimony to that effect, as I recall, that in fact narcotics were located by a police officer inside the entryway of an apartment building where [the petitioner] was apprehended, I believe, from a mailbox. And so the credibility of the police officer's testimony was certainly a crucial issue, I believe." Respecting the defense contention, much of the aforesaid was not before the jury but was testimony presented on an offer of proof while the jury was excused.

[37] At the hearing on the motion for new trial (November 15, 2004), it was observed that if the information regarding Ortiz had been known, the witness would not have been called at trial or, if called, he quite likely would have asserted the fifth amendment privilege.

October 22, 2004. The supporting affidavit recites that a written, sworn to citizen's complaint was filed with the internal affairs division on September 22, 2004; the investigation of the complaint revealed that, among other things, Ortiz had falsified information contained in a search warrant affidavit, which search warrant was executed at the complainant's residence on September 2, 2004.[38] On April 8, 2008, Ortiz entered an *Alford* plea to a one count substitute information charging false statement in the second degree, and the case was continued for sentencing on April 29, 2008.[39] The "parameters of the factual basis" were detailed on the record at the April 29 sentencing proceeding.[40]

Documentary evidence presented at the trial on this petition established the following with respect to Henderson. An arrest warrant for Henderson was signed by Judge Norko on January 9, 2006. He appeared in court on January 25, 2006, to answer to a ten count information: first degree larceny (one count); second

[38] The search warrant was presented and issued on August 28, 2004.

[39] The entry on the information shows the date of the plea as April 8, 2008; in a transcript of the April 29 sentencing proceeding (the petitioner's exhibit #14), the date the plea was entered is stated as April 4, 2008.

[40] The assistant state's attorney stated that the "search warrant had falsehoods in it, including the identity of the drugs that were sold allegedly by an occupant . . . to a confidential informant, and also the identity of the person who allegedly sold that." Further, that "the co-affiant indicated under oath that he and the [petitioner] . . . were handed those two drugs by the confidential informant when, among other things, that co-affiant wasn't even present." Also, that the [petitioner], "and somebody else," prepared an incident report, under oath, for the prosecutor, indicating "that a handgun was recovered inside . . . a bedroom occupied by the complainant and that the complainant was a convicted felon." In fact, the complainant "was not a convicted felon," and, "in fact, the gun was retrieved from a car which was parked down in the garage area of that apartment." The prosecutor further stated "that the detective who recovered that weapon indicated that he procured it from the dashboard area or the console area of the van parked inside the garage," and, "[t]here was no search warrant application— the area to be searched was only for the premises . . . not for a motor vehicle, certainly not for a motor vehicle parked inside the garage."

degree forgery (four counts); tampering with/fabricating physical evidence (four counts); and tampering with a witness (one count).[41] The arrest warrant affidavit indicated that the investigation into the conduct of Detective Henderson began in early January, 2006, and was precipitated by a fellow detective reporting that Henderson had requested the case number for a case in which no informant was paid in order that he (Henderson) could pay one of his informants out of the investigative funds account using that case number. The fellow officer became suspicious, reported the request to a supervisor, and the matter was referred to the internal affairs division. The resulting investigation revealed that on a number of occasions, spanning the years from 2000 to 2006, paperwork was submitted for withdrawal from the account for payments to confidential informant, No. 255, and no such payments were made, Henderson retaining the moneys for his own use.[42] Certain of the paperwork submitted contained allegedly forged signatures, and it was further alleged that as the internal investigation proceeded, Henderson urged No. 255 to lie to the investigators. On October 26, 2007, Henderson entered a written plea of nolo contendere to the second count of the long form information, forgery in the second degree.[43] The state indicated

[41] A long form information containing the same counts was filed on October 18, 2007.

[42] The affidavit recites: "Forty-three Request for Investigative Fund forms totaling disbursements of $6,665.00 were reviewed. These forms were all completed and submitted by Detective Henderson and show what appear to be disbursements of monies to informant #255." The affidavit also states that the informant so designated told the investigators that "he has provided information to Detective Henderson since 2000 and has never received payment for any information."

[43] The second count charged as follows: "in and around the city of Hartford, on or about December 17, 2004, the said Alfred Henderson with intent to defraud, deceive or injure another, did falsely make, complete or alter a written instrument or issue or possess a written instrument which he knew to be forged, which was or purported to be, or which was calculated to become or represent if completed, a public record or an instrument filed or required or authorized by law to be filed in or with a public office or

it had no objection to the nolo plea, provided the factual basis was stated on the record;[44] the plea was canvassed, accepted, a presentence investigation waived, and the case was continued for sentencing.[45]

## A

## Legal Standard

This petition is brought pursuant to General Statutes § 52-270 and Practice Book § 42-55. The latter provides: "A request for a new trial on the ground of newly discovered evidence shall be . . . brought in accordance with General Statutes § 52-270. . . ." The statute reads: "The Superior Court may grant a new trial of any action that may come before it, for . . . the discovery of new evidence . . . ." The governing standard is set forth in

public servant; and a written instrument officially issued or created by a public office, public servant or governmental instrumentality in violation of Section 53a-139 (a) (2) and (3) of the Connecticut General Statutes."

[44] The assistant state's attorney articulated the factual basis, as follows: "The facts underlying the charge . . . arose during the period 2000 to 2006, at which time the defendant was a detective. On December 21, 2005, the defendant and [another detective] arrested an individual on gun charges in part on information . . . provided by an . . . informant. The day after the defendant called . . . [the other detective] . . . and verified that no other . . . [confidential informant] was paid for information leading to that arrest. He then asked for the case number so he could pay one of his . . . informants. . . . [The other detective] reported this . . . to a supervisor. . . . Investigation revealed an ongoing scheme by Henderson beginning in 2000 and continuing to 2006 in which Henderson took cash from the . . . fund, made it appear as if those payments were being used to pay a confidential informant, known as No. 255, when, in fact, Mr. Henderson kept the proceeds. . . . On at least four occasions . . . Mr. Henderson signed a fellow [officer's] signature to an attestation contained on a document, the purpose of which was to deceive the [Hartford police department] by having them believe that the [fellow officer] . . . witnessed the defendant disperse proceeds to [confidential informant] No. 255. . . . The investigation further revealed that . . . the defendant, aware that he was being investigated, altered official documents in an effort to conceal his illegal activities . . . [and] that the defendant went to . . . No. 255 and informed him the authorities would be contacting him . . . and that he, the [confidential informant] No. 255, should lie to those investigators . . . ."

[45] Sentence was imposed on February 4, 2008.

*Asherman* v. *State*, 202 Conn. 429, 434, 521 A.2d 578 (1987): "[t]he petitioner must demonstrate, by a preponderance of the evidence, that: (1) the proffered evidence is newly discovered, such that it could not have been discovered earlier by the exercise of due diligence; (2) it would be material on a new trial; (3) it is not merely cumulative; and (4) it is likely to produce a different result in a new trial." As made clear in *Asherman*, and other precedents, this is a "strict standard" and is "meant to effectuate the underlying 'equitable principle that once a judgment is rendered it is to be considered final,' and should not be disturbed . . . except for a compelling reason." Id.

The standard as stated in *Asherman* has roots that can be traced back to certain of Connecticut's earliest precedents; in *Hamlin* v. *State*, 48 Conn. 92, 93–94 (1880), the Connecticut Supreme Court "articulated the test in terms virtually identical to that . . . later adopted in *Asherman*." *Shabazz* v. *State*, 259 Conn. 811, 821, 792 A.2d 797 (2002); see also *Lombardo* v. *State*, 172 Conn. 385, 391, 374 A.2d 1065 (1977); *Taborsky* v. *State*, 142 Conn. 619, 623, 116 A.2d 433 (1955); *Smith* v. *State*, 141 Conn. 202, 208, 104 A.2d 761 (1954). A petition for a new trial is a civil action; accordingly, the petitioner's burden of proof is a preponderance of the evidence. *Lombardo* v. *State*, supra, 390–91. A petition for a new trial should never be granted except on "substantial grounds." *Shabazz* v. *State*, supra, 822; *Lombardo* v. *State*, supra, 391. Indeed, new trials are granted "only with great caution . . . in the most extraordinary circumstances." (Internal quotation marks omitted.) *United States* v. *Biaggi*, 823 F. Sup. 1151, 1156 (S.D.N.Y. 1993), aff'd, 48 F.3d 1213 (2d Cir. 1994).[46]

---

[46] In *Biaggi*, of course, the District Court was dealing with Fed. R. Crim. P. 33, which is dissimilar to § 52-270. In *Biaggi*, the court (Motley, J.) stated: "A district court should only grant Rule 33 motions in the most extraordinary of circumstances, i.e., when the new evidence would probably lead to an acquittal." *United States* v. *Biaggi*, supra, 823 F. Sup. 1156. In Connecticut,

While the four-pronged standard regarding newly discovered evidence is long established in our law, some precedents also have considered, under certain circumstances, "whether an injustice was done . . . ." *Taborsky* v. *State*, supra, 142 Conn. 623; *Santiago* v. *State*, 47 Conn. Sup. 130, 779 A.2d 868 (1999), aff'd, 64 Conn. App. 67, 779 A.2d 775, cert. denied, 258 Conn. 913, 782 A.2d 1246 (2001); *Reilly* v. *State*, 32 Conn. Sup. 349, 355 A.2d 324 (1976). However, this additional consideration appears to have been limited to capital cases.[47] *Taborsky* v. *State*, supra, 623; *Andersen* v. *State*, 43 Conn. 514 (1876); *Joyce* v. *State's Attorney*, 84 Conn. App. 195, 852 A.2d 841, cert. denied, 271 Conn. 923, 859 A.2d 578 (2004).

## B

## Application of the Legal Standard

### 1

### Newly Discovered/Due Diligence

The first requirement is that the proffered evidence be newly discovered such that it could not have been discovered earlier by the exercise of due diligence. The petitioner has alleged that "[k]nowledge of the criminal activities of these police officers was discovered by [p]etitioner subsequent to his guilty verdict and was

as early as 1836, our Supreme Court observed: "It hardly need be remarked, that a petition for a new trial . . . will never be granted but upon substantial, and not merely formal grounds . . . ." *Lester* v. *State*, 11 Conn. 415, 418 (1836).

[47] In summation (civil trial), the petitioner's counsel referred to this somewhat modified standard, stating: "On the second page of my brief, I cite *Shabazz* and *Morant* [v. *State*, 68 Conn. App. 137, 802 A.2d 93, cert. denied, 260 Conn. 914, 796 A.2d 558, overruled in part by *Shabazz* v. *State*, 259 Conn. 811, 830 n.13, 792 A.2d 797 (2002)], which basically follow *Asherman*, which gives . . . what the courts recognize as the four part test . . . in most cases . . . I say most cases because under *Andersen* and *Taborsky* . . . there's a different standard for the petition for new trial. Particularly under . . . part four of the *Asherman* test . . . under *Asherman* and *Taborsky*, which, I believe, involved capital cases . . . the court determined that the test probably was a little more lenient with cases that involved a human life . . . ."

not discoverable by him prior to that date." In its answer, the state neither admitted nor denied this allegation, but left the petitioner to his proof. However, in summation the respondent "conceded" that the evidence is newly discovered and that the criminal defense attorney exercised due diligence.[48] Obviously, the convictions of Ortiz and Henderson could not have been discovered by the defense, and used to impeach, since the convictions did not occur until some years after the petitioner's trial. With reference to the investigations that ultimately led to those convictions, the complaint on Ortiz was not made to the internal affairs division until September 22, 2004 (the date Ortiz testified at the petitioner's trial), and the investigation of Henderson did not begin until early January, 2006. As attorney Weingast testified, he had no reason to believe that either officer was engaging in misconduct and, therefore, did not undertake to subpoena personnel/internal affairs division files, believing, as he put it, he could not have met any threshold respecting an in camera review.[49]

---

[48] This concession was in the context of the petitioner's opening summation.. The petitioner had stated that the newly discovered evidence was the convictions of Ortiz and Henderson: "Our position is that the newly discovered evidence involves both . . . Henderson and Ortiz, and why it is newly discovered at this time is because the convictions, as a result of plea, did not take place until 2008, well after the petitioner's trial. Prior to their conviction . . . it is unlikely that any of the information could have been utilized . . . because . . . anybody representing either Ortiz or Henderson is going to advise them to plead the fifth . . . . Now, once there is a conviction, the underlying facts are usable . . . . And so the newly discovered evidence became ripe in 2008 upon the convictions of both of these police officers. The smoking gun was back at or near the time of . . . trial . . . . Until there was either a plea or a trial with these two officers, I don't believe anything could have been done with their wrongdoings insofar as impeachment is concerned and so far as attacking their credibility is concerned." In the respondent's trial brief, filed April 7, 2009, and the petitioner's reply brief, filed April 17, 2009, each party agreed that the evidence was newly discovered within the ambit of *Asherman*'s first prong.

[49] Concerning production and inspection of the files, the investigation of Henderson would not have been revealed since, as stated, the complaint and investigation did not occur until 2006. As to Ortiz, nothing would have

Based on the above, this court is disposed to consider the first *Asherman* requirement satisfied.

## 2

## Materiality

The second *Asherman* prong is that the newly discovered evidence would be material on retrial. Evidence is material when it involves a central issue in the case and is not collateral. See, e.g., *Adams* v. *State*, 259 Conn. 831, 836, 792 A.2d 809 (2002), referencing resolution of the dispositive issue in *State* v. *Valentine*, 240 Conn. 395, 399–405, 692 A.2d 727 (1997). Evidence is admissible if it is offered to prove a material fact, namely, those facts directly in issue or those probative of matters in issue. *Adams* v. *Way*, 32 Conn. 160, 167–69 (1864); C. Tait & E. Prescott, Connecticut Evidence (4th Ed. 2008) § 4.1.3, p. 136. It has been long established that "[t]he general rule is . . . a new trial will not be granted on account of newly discovered evidence to impeach the character of witnesses sworn on a former trial." *Tappin* v. *Clarke*,

---

been revealed prior to the trial since the complaint regarding the search warrant falsification and the investigation thereof occurred on or after September 22, 2004. Simply a complaint, and/or the initiation of an investigation, quite probably would not have been available to effectively impeach since, at that time, the information was merely accusatory, no disciplinary action had been taken, there had been no finding of probable cause, no arrest, and, of course, no conviction. See *State* v. *Betances*, 265 Conn. 493, 507, 828 A.2d 1248 (2003) ("a defendant's request for information from a confidential police personnel file should be specific and should set forth the issue in the case to which the personnel information sought will relate" [internal quotation marks omitted]); *State* v. *Januszewski*, 182 Conn. 142, 172, 438 A.2d 679 (1980) ("[i]t has been widely noted that [police personnel records] often contain raw data, uncorroborated complaints, and other information which may or may not be true but may be embarrassing" [internal quotation marks omitted]), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981); *State* v. *Corley*, 177 Conn. 243, 245–46, 413 A.2d 826 (1979) ("evidence of arrest without conviction is not admissible to attack the credibility of a witness"), citing *State* v. *Annunziato*, 169 Conn. 517, 524, 363 A.2d 1011 (1975), overruled in part on other grounds by *State* v. *Pinnock*, 220 Conn. 765, 791, 601 A.2d 521 (1992).

32 Conn. 367, 369 (1865). The state contends that the petition must fail under this second prong because the newly discovered evidence, that is, the 2008 convictions of Ortiz and Henderson, are not material in that such evidence is collateral and could be used only for impeachment. The Connecticut Supreme Court has stated: "we note that '[n]ew trials [typically] are not granted upon newly discovered evidence which discredits a witness unless the evidence is [both so] vital to the issues and . . . strong and convincing . . . .' " *Adams* v. *State*, supra, 839, quoting *Turner* v. *Scanlon*, 146 Conn. 149, 163, 148 A.2d 334 (1959).[50]

Here, elements of crimes charged in the information included intent to sell and knowing possession. The court charged at length on those elements; the testimony of Ortiz and Henderson regarding the petitioner's prior and subsequent crimes was admitted as some evidence for the jury to consider just with respect to those elements. In both the charge and the cautionary instructions, the very limited purpose for which the "other crimes" evidence could be considered was articulated explicitly and emphatically. The evidence related to necessary elements and issues central to the case. Although the witnesses were thoroughly cross-examined, and although the date of one incident was quite remote (a factor the jury could consider respecting weight), and although there was other evidence pertaining to the necessary elements, the "other crimes" evidence was quite powerful, respecting its limited purpose, and went in virtually unimpeached. While it is a

---

[50] "The rule restricting the right to a new trial when one is claimed on the basis of newly discovered evidence merely affecting the credibility of a witness is necessary because 'scarcely has there been an important trial, with many witnesses, where [after the trial] diligent search would not have discovered evidence [to impeach the character of] some witness on the trial.' " *Lancaster* v. *Bank of New York*, 147 Conn. 566, 578, 164 A.2d 392 (1960); *Tappin* v. *Clarke*, supra, 32 Conn. 369. "[W]ithout [such a rule] there might never be an end to litigation." *Turner* v. *Scanlon*, supra, 146 Conn. 163.

close question, in the unique circumstances of this case, it is my view that the convictions of these witnesses, stemming from criminal activity occurring before, during, and after the petitioner's trial, are material.

### 3

### Cumulative

The third requirement is that the newly discovered evidence not be merely cumulative. "By cumulative evidence is meant additional evidence of the same general character, to the same fact or point which was the subject of proof before." *Waller* v. *Graves*, 20 Conn. 305, 310 (1850). It is evidence of the "very same fact and the same attending circumstances, testified to upon the former trial, and . . . of the very same nature as that before offered in proof of that same fact." (Internal quotation marks omitted.) *Reilly* v. *State*, supra, 32 Conn. Sup. 355, citing *Apter* v. *Jordan*, 94 Conn. 139, 141–42, 108 A. 548 (1919). "[E]vidence which brings to light some new and independent truth of a different character, although it tends to prove the same proposition or ground of claim before insisted on, is not cumulative within the true meaning of the rule." (Internal quotation marks omitted.) *Andersen* v. *State*, supra, 43 Conn. 519; *Waller* v. *Graves*, supra, 311; *Reilly* v. *State*, supra, 355. Under these definitions, the witnesses' subsequent convictions are not, in my view, cumulative; neither the convictions nor the details and results of internal investigations were known at the time of the petitioner's trial and, therefore, not referred to in the evidence.

### 4

### Different Result

The fourth prong of the *Asherman* standard is that the newly discovered evidence is likely to produce a different result in a new trial. The *Asherman* language

"likely to produce a different result," as well as the proper role of the court in applying that language, was clarified in *Shabazz* v. *State*, supra, [259 Conn. 827–28] and *Adams* v. *State*, supra [259 Conn. 838]. These cases indicate that "likely to produce a different result" rises to the higher level of "probably *would* [not could] yield a different result . . . ." (Emphasis added; internal quotation marks omitted.) *Adams* v. *State*, supra, 838, citing *Shabazz* v. *State*, supra, 827–28. A petitioner "must persuade the court that the new trial evidence . . . will *probably*, not merely possibly, result in a different verdict at a new trial . . . . It is not sufficient . . . to bring in new evidence from which a jury could find him not guilty . . . it must be evidence which persuades the judge that a jury *would* find him not guilty." (Emphasis altered.) *Shabazz* v. *State*, supra, 823; *Daniels* v. *State*, 88 Conn. App. 572, 578, 870 A.2d 1109, cert. denied, 274 Conn. 902, 876 A.2d 11 (2005); *Morant* v. *State*, 68 Conn. App. 137, 149–50, 802 A.2d 93, cert. denied, 260 Conn. 914, 796 A.2d 558, overruled in part on other grounds by *Shabazz* v. *State*, 259 Conn. 811, 830 n.13, 792 A.2d 797 (2002); *State* v. *Roberson*, 62 Conn. App. 422, 427, 771 A.2d 224 (2001). In *Morant* v. *State*, supra, 149, the court affirmed the denial of a petition on the basis that it was not probable the alibi testimony "*would* result in a different verdict at a new trial." (Emphasis added.)

It is axiomatic that the court, in reaching its determination on a petition for a new trial, must always consider the newly discovered evidence in the context of the evidence presented at the original trial. *Adams* v. *State*, supra, 259 Conn. 838; *Shabazz* v. *State*, supra, 259 Conn. 827; *Reilly* v. *State*, supra, 32 Conn. Sup. 356 (court to determine "whether the evidence presented at the hearing considered with the evidence at the original trial warrants the granting of a new trial"). As stated previously, the *Asherman* standard is a "strict" one,

meant to assure that final judgments are not disturbed postverdict absent compelling reasons. *Asherman* v. *State*, supra, 202 Conn. 434; *Daniels* v. *State*, supra, 88 Conn. App. 577. Also, as stated, while some lessening in the strict application of the *Asherman* four-pronged standard may be appropriate in capital cases (looking beyond the four-pronged test and being guided by the general principal of whether an injustice was done), such deviation from the strict traditional test is not warranted in cases, such as the instant one, not involving murder or manslaughter. *Joyce* v. *State's Attorney*, supra, 84 Conn. App. 203–204.

If, at a new trial, Henderson again testified regarding his February 19, 1999 confrontation with the petitioner, the defense certainly could, and presumably would, impeach the credibility of his testimony through the use of his February 4, 2008 felony conviction (second degree forgery), particularly considering that the details of the continuing criminal conduct (as set forth in the factual basis) ran from 2006 back through, and well preceding, the petitioner's trial. See Conn. Code Evid. § 6-7, evidence of conviction of crime; Conn. Code Evid. § 6-6 (b), evidence of character and conduct of witness. Similarly, if Ortiz again testified, the credibility of his testimony could, and would, be impeached; the details underlying the witness' April 29, 2008 misdemeanor conviction (false statement in the second degree), as set forth in the factual basis placed on the record at the time of the plea, constituted specific acts of misconduct bearing on lack of veracity. See Conn. Code Evid. § 6-6 (b), evidence of character and conduct of witness.

However, both parties agree, and the state has represented, that in a new trial, neither of the two witnesses would be called to testify regarding the petitioner's other crimes in view of their now known impeachability. It is the state's position that the testimony of the remaining state's witnesses who testified at the original

trial, together with the items admitted in evidence at that trial, would very probably result in a guilty verdict, notwithstanding the absence of Ortiz and Henderson. This court agrees.

The initial inquiry, then, is whether without the "other crimes" evidence it is *probable* the result *would* be different. As the preliminary instructions, the cautionary instructions, and the charge made abundantly clear to the jury, the limited purpose of the "other crimes" evidence was to further the state's proof of the required intent, knowing possession, and noncoincidental presence at the scene. In my view, there was, and is, sufficient other evidence, i.e., evidence exclusive of the "other crimes" testimony, establishing intent, knowledge, and noncoincidental presence. The unimpeached testimony of Officer Martinez, Detective Scates, and the toxicologist Mielguj, together with exhibit #1, would be sufficient at a second trial, to establish the elements of the crimes charged. In such regard, the jury was, in the original trial, and would be in a second trial, thoroughly and comprehensively charged on burden of proof, credibility of witnesses, circumstantial evidence, intent, knowledge, inferences, and expert testimony.

Both Martinez and Scates testified to the details of the surveillance of 57 Belden Street from a distance of approximately 100 yards, including: their observations of the activities of the three individuals outside the building, one of whom was the petitioner; the three being approached by suspected drug users approximately ten or eleven times; after brief conversations, one of the three going into the building with the suspected user, who promptly exited the building, and left the immediate area; the three taking turns escorting suspected users into the building, while two men remained outside as lookouts; and the petitioner escorting two suspected users into the building. From these facts, along with other evidence at trial (including all

the contraband and currency thereafter seized), and coupled with the testimony of the officers, based on their training and experience, as to how drug sales are generally carried out, a jury could, and probably would, reasonably infer that drug sales were being conducted by the three individuals at 57 Belden immediately prior to the petitioner's being seen discarding drugs (exhibit #1) at that location. Such an inference would be probative of intent, knowledge that the exhibit consisted of drugs, and that the petitioner's presence was a participating one, not merely coincidental.

Similarly, the testimony of Officer Martinez regarding the throwing of the drugs (exhibit #1) under a parked automobile, as numerous officers approached the front of the building, if believed, would support an inference that the petitioner knew what he held was illicit contraband, and that he was part and parcel of the activity then taking place at 57 Belden. Moreover, the testimony of Detective Scates regarding actually seeing the item under the vehicle, as well as observing the retrieval by Officer Martinez of the discarded contraband from beneath the vehicle, if accepted, serves to buttress both the Martinez testimony and the inference that could be drawn respecting intent, intent to sell, knowledge that the substance was cocaine, and the petitioner's involvement in the drug sales activity. Further basis for the inference(s) is provided by the testimony of the officers grounded on their training and experience, and from the narcotics and currency seized from the three participants.

Exhibit #1, itself, is *most* probative of general and specific intent, knowledge, and noncoincidental presence. The very manner in which the cocaine was packaged is *indisputably* indicative of intent to sell; examination of the exhibit reveals that the crack cocaine is broken into small chunks and packaged in a plastic bag, with each of the several small chunks

tied or knotted off in a separate small section (some twelve small bags), and each of which could then be untied or torn off for the customer as each sale is consummated.[51] Both Officer Martinez and Detective Scates testified in some detail, based on their training and experience, concerning the methods of packaging of cocaine for street sales; they testified that exhibit #1 was packaged in a manner for conducting low level crack cocaine sales.

Both the val-tox or field test performed on exhibit #1 by Officer Martinez and the laboratory analysis of Mielguj indicated the substance was cocaine. The testimony indicated that the weight of the exhibit when seized was approximately forty-two grams; Mielguj later determined the weight to be 25.1 grams, attributing the difference in weight to deterioration of the substance over time. Weight or quantity of the contraband may also be a consideration bearing on intent to sell; in considering such testimony a jury, of course, would have to assess the weight discrepancy, and the toxicologist's explanation.

It is my view that the aforesaid evidence, in its entirety, if accepted by a new jury, along with the reasonable inferences that could be drawn therefrom, would permit such jury, under the required standard of proof (beyond a reasonable doubt), to find intent to sell, knowing possession, and noncoincidental presence, without any additional proof of "other crimes." Additionally, while acknowledging that the state's witnesses were thoroughly cross-examined, and accepting the defense testimony for present purposes, I am unable to conclude that the evidence presented by the state at the trial was controverted to such a degree (if, at all) that on a new trial, without "other crimes" evidence, it is *probable* the result *would* be different.

---

[51] This court, having taken judicial notice of the criminal file, examined the full exhibits, including exhibit #1.

Additionally, considering the newly discovered evidence in the context of an unlikely scenario in which Ortiz and Henderson would testify at a new trial, it remains my view that although the result *possibly could* be different, the new impeachment evidence does not warrant a finding, established by a fair preponderance, that the result *probably would* be different. On a retrial, Ortiz and Henderson, in the unlikely event they were called, would testify, presumably in the same manner, as to the petitioner's other crimes; the newly discovered evidence would be used by the defense to impeach the credibility of their testimony. If, despite the impeachment, the jury believed all or part of the "other crimes" testimony (seemingly an unlikely eventuality), the other crimes evidence could be weighed by the jury, affording to it whatever weight, if any, the jury saw fit, with respect to intent, knowledge, and noncoincidental presence. If the jury, following the witnesses' impeachment, rejected the other crimes evidence, it could very well, in my view, still find, inferentially, from the state's other evidence (Martinez, Scates, exhibit #1 and Mielguj) *intent to sell, knowing possession, and noncoincidental presence* proven beyond a reasonable doubt.[52] Thus, even in the unlikely event that Ortiz and Henderson did testify, it has not been established, by a preponderance, that the result *probably would* be different.

---

[52] One might understandably surmise that the acts of misconduct of Ortiz and Henderson were so egregious that upon hearing the impeachment evidence, the jury would not only reject the "other crimes" testimony, but also would be tainted against objectively assessing the credibility of other officers who testified in the case. The language contained in standard instructions on credibility of witnesses and impeachment evidence of prior convictions (repeated reference to "the witness") or misconduct of witnesses ("duty to determine whether this witness is to be believed") would address, and, if followed, preclude any such reactions or tendencies on the part of jurors. Jurors are presumed to follow and abide by the court's instructions. *State v. Wallace*, 290 Conn. 261, 276, 962 A.2d 781 (2009) ("[t]he jury is presumed, in the absence of a fair indication to the contrary, to have followed the court's instructions" [internal quotation marks omitted]).

## III

## CONCLUSION

Applying the strict *Asherman* standard in conformity with existing case law, and considering the newly discovered evidence in the context of the evidence presented at the original trial, it is my best judgment that the petitioner has not established, by a preponderance of the evidence, that the newly discovered evidence (impeachment of "other crimes" witnesses) is likely to produce (i.e., probably would produce) a different result in a new trial. Accordingly, the petition is denied.